*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PHILIP J., | ) | |
| | ) | Supreme Court Nos. S-14810/14994 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court Nos. 4BE-10-00013/14/ |
| | ) | 15/16/17/18/19 CN; 4EM-11-00014 CN |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | O P I N I O N |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 6853 – December 13, 2013 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Leonard Devaney, Judge.

Appearances: Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. Carolyn Perkins, Assistant Public Advocate, Office of Public Advocacy, Anchorage, for Appellee Mother.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.    INTRODUCTION

Philip J. is the father of nine children.  The superior court terminated Philip's parental rights to his seven oldest children and then to his eighth child.  Philip's appeals of the two separate termination orders (Case No. S-14810 and Case No. S-14994) were consolidated for consideration and decision. Philip maintains that the superior court erred in finding that active efforts were made to keep this Indian family together in both termination orders.  He also argues that the superior court erred when it determined that his eighth child was a child in need of aid. We affirm both orders terminating Philip's parental rights.

## II.    FACTS AND PROCEEDINGS

Philip J. and Georgina J. are the biological parents of nine children: Sophie, Anne, John, Katherine, Nellie, Olivia, Alexandra, Alyssa, and Pete.[1]  The children are members of the Asa'carsarmiut Tribe, and the Indian Child Welfare Act (ICWA) applies to this case.[2]  These are the second and third child in need of aid (CINA)[3] appeals related to this family.[4]  The superior court terminated parental rights as

---

[1]    Pseudonyms are used throughout to protect the privacy of the parties.

[2]    *See* 25 U.S.C. § 1912 (2006) (requiring that "[a]ny party seeking . . . termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made . . . to prevent the breakup of the Indian family"); *id.* § 1903(4) (defining "Indian child" to include "any unmarried person who is under age eighteen and is . . . a member of an Indian tribe").

[3]    *See* AS 47.10.011 (specifying the conditions under which a child can be found to be in need of aid).

[4]    Philip appealed the February 2011 adjudication of his seven oldest children as children in need of aid. *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 264 P.3d 842 (Alaska 2011).

to the seven oldest children in a June 29, 2012 order and as to the eighth child, Alyssa, in a November 14, 2012 order.[5]

## A. OCS Involvement 2004-2006

Philip and Georgina's history with OCS began in August 2004 when Philip and Georgina became "extremely intoxicated," and Philip "fired a rifle in the home and held the family hostage for three hours."[6] Philip was arrested for the offense.[7] OCS investigated the incident and developed a safety plan addressing Georgina's substance abuse and Philip's violent behavior, but Georgina did not complete any of the suggested steps.

One evening in April 2005, Philip assaulted Georgina while both were extremely intoxicated.[8] Philip also sexually assaulted a guest in the home. As a result of the incident, Philip was charged with and pleaded no contest to third-degree assault and the manufacture of alcoholic beverages without a license or permit in a local option area.[9] OCS initiated emergency removal proceedings, placing the children with Edna, Georgina's mother. The superior court adjudicated the children in need of aid.[10] The first case plan was developed in May 2005 and updated in July 2005.

---

[5]  The ninth child, Pete, is the subject of a separate CINA proceeding.

[6]  *Philip J.*, 264 P.3d at 843.

[7]  Even before this incident, Philip had a criminal record. He was convicted of fourth-degree assault in 2000, and in 2003 he pleaded no contest to driving while intoxicated.

[8]  *Philip J.*, 264 P.3d at 843.

[9]  *Id.* at 843-44.

[10]  The children were found to be in need of aid under AS 47.10.011(6), (8), (9), and (10).

The plans outlined services to address Georgina's substance abuse and the domestic violence perpetrated against her by Philip. Georgina began the recommended substance abuse counseling, but she quickly ceased participation. The case plan called for Philip to take classes at the Yukon Kuskokwim Correctional Center and meet with the Mountain Village ICWA staff. While Philip was incarcerated, OCS was in contact with Philip's probation officer, and Philip was provided with a copy of the case plan. Philip participated in several classes while incarcerated.[11]

The family's stability improved during the summer of 2006, and OCS returned the children. Philip was no longer incarcerated, and he engaged with services. Edna was involved with the children on a daily basis, and the Tribe was monitoring the family. But despite Philip's effort prior to the children's return, he quickly ceased his clinic attendance. And although not reported to OCS at the time, in December 2006, while children were present and Georgina was intoxicated, Philip tried to rape Georgina's sister.

## B.    OCS Involvement 2008-2010

In July 2008 OCS again became involved with the family.[12] Philip's sister Annika testified that Philip tried to force her to have sex with him.[13] And Philip ultimately fought with Annika's husband. The children were present during the incident.

---

[11]    Philip received certificates of completion for the following programs: "Spirituality, Emotional Freedom Technique, Danger of Nicotine and Tobacco, Goal Setting, The Vietnam War Experience, and Substance Abuse Classes."

[12]    *Philip J.*, 264 P.3d at 844.

[13]    Annika testified that she did not distinctly remember when Philip and Georgina were trying to take her clothes off because she was too intoxicated. Her testimony was admitted over objection.

Philip was convicted of fourth-degree assault on his sister's husband and sentenced to 90 days in jail.

An OCS worker promptly investigated the incident, finding "parental substance abuse, lack of supervision by both parents, and exposure of the children to domestic violence."[14] After the investigation, OCS substantiated most of the report, finding that some of the children were neglected and some were exposed to mental injury from observing a fight between their father and uncle. OCS neither took custody at that time, nor did it develop a family case plan.

OCS received another report of harm in October 2008, this time from the Bethel Police.[15] OCS substantiated the report, finding that "the parents were abusing substances, exposing the children to the elements, and exposing the children to domestic violence."[16] The children were placed in a foster home for that night, and the case was referred to the OCS office in St. Mary's for case management.

In September 2009 OCS received two more reports indicating that the children had been neglected and exposed to domestic violence.[17] And in November 2009 an Alaska State trooper conducted a welfare check based on a school report that Katherine had a severe bruise. Katherine reported that she felt scared to go home, and when the trooper investigated, he found Philip in a "highly intoxicated" state. Eight days later, the troopers received another report in which Katherine reported intoxication and domestic violence. An OCS social worker investigated and substantiated the reports in

---

[14] *Philip J.*, 264 P.3d at 844.

[15] *Id.*

[16] *Id.*

[17] *Id.*

December 2009. Philip "denied anything having to do with domestic violence" and "said everything was fine." OCS took no additional action in 2009.

OCS received additional reports of harm from the Tribe in early 2010, alleging that Philip had sexually assaulted his daughter Anne and possibly his daughters Sophie and Nellie.[18] The Tribe's reports indicated that Philip repeatedly vaginally penetrated Anne. When Georgina tried to intervene, Philip beat her.[19] Anne reported that her little sisters witnessed the alleged sexual assault and domestic violence.

A trooper interviewed Georgina four days after the incident, and she reported that Philip "went after" two of the children. Georgina indicated that she confronted Philip to protect the other children, despite having an infant in her arms and that Philip hit her in the head and sides and kicked her in the legs.[20] Georgina reported that she was very afraid of Philip and that he had threatened to kill her and her children.[21] She also reported an earlier incident when Philip struck her with a table leg while he was intoxicated. Philip was convicted of assault in the fourth degree and incarcerated until April 2010.[22]

---

[18] *Id.* Their aunt Cathy helped Sophie and Anne write letters detailing the abuse. Cathy testified that Sophie dictated and that she wrote down Sophie's words and then Sophie signed it. In her letter, Anne reported that her dad had humped her, that her mom tried to take him off of her, but that her dad beat up her mom and then humped her again.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] The trooper testified that Georgina reported that the incident took place on February 8, 2010, but the judgment cited January 26, 2010 as the date of the violation.

After the trooper met with Georgina, she sought medical care from the Yukon-Kuskokwim Health Corporation in Bethel, where an x-ray showed evidence of healing fractures in her ribs. OCS offered to take Georgina and her children to the Emmonak Women's Shelter to protect them from domestic violence, but Georgina declined the offer.

In February 2010, while Philip was incarcerated, Edna and Georgina petitioned the Asa'carsarmiut Tribal Court in Mountain Village for an emergency protective order and a long-term protective order, attesting that Philip was "always drinking almost every other day and he [was] always beating on his wife and picking on his children" and that the children were often scared to go home. They further alleged that Philip "even point[ed] a gun at Georgina and her kids and sa[id] he could kill them." The Tribal Court issued the emergency protective order against Philip to protect both Georgina and the children.[23]

On February 25, 2010, an OCS worker investigated the reports of sexual assault. The OCS worker substantiated the report of harm based on physical and sexual abuse as well as mental injury to the children. The OCS worker concluded that because Philip was in jail, there was no immediate safety threat, and OCS did not take custody at that time.

The next month another OCS worker met with Georgina. The OCS case worker discussed counseling services and the children's educational needs. At the time, OCS efforts primarily targeted the needs of Georgina and the children. Georgina agreed

---

[23] Ultimately, the long-term protective order was issued in April 2010 after a tribal hearing, and it prohibited Philip from contacting the family; entering the boundaries of the Asa'carsarmiut Tribe, which includes Mountain Village; or going within 500 yards of his children. Because he was no longer permitted to live in Mountain Village, he moved to Alakanuk.

to have Sophie and Anne participate in assessments and meet with the behavioral health aide in the village, but she was not receptive to any other options.[24] The OCS worker suggested that the family work with the Tribal elder council to improve school attendance, made referrals for the family to see the behavioral health aide in Mountain Village, and provided assessment referrals to the Yukon-Kuskokwim Health Corporation in Bethel.

Clinic staff at the Yukon-Kuskokwim Health Corporation received referrals from OCS for the children, and the clinic was willing to provide family counseling. Georgina attended an initial screening but did not participate in an assessment, and family counseling did not begin. The conditions of Philip's release mandated that he complete "[i]ntegrated treatment, mental health, [and] alcohol counseling" starting no more than 48 hours from release. And although Philip set up an appointment, he did not attend the appointment or get an assessment.

## C.    The Seven Oldest Children Are Removed

In April 2010 the Tribe informed OCS that Philip had returned to Mountain Village, in violation of the Tribal Court protective order. An OCS family services supervisor went to Mountain Village to meet with the family. The supervisor spoke with Georgina and identified domestic violence, sexual abuse, and substance abuse as safety threats. The supervisor explained that OCS would remove the children if Georgina stayed with Philip and offered to take Georgina and the children to a domestic violence shelter in Emmonak,[25] but Georgina said she "wasn't going anywhere." Instead, Georgina packed clothing for the children and handed one of the babies to the

---

[24]    This social worker testified that Georgina did not want referrals for herself but then testified that Georgina agreed to visit the behavioral health aide in Mountain Village.

[25]    *Philip J.*, 264 P.3d at 844.

supervisor.[26] OCS took custody of the seven children, eventually placing them with their grandmother, Edna, in Mountain Village.

In May 2010 OCS specialist Iura Leahu was assigned to the family's case. At this time, the children were still living with Edna. Leahu met with and observed most of the children, discussed case planning with Georgina, and worked with the Tribe to develop a case plan. Georgina was not receptive.

Leahu spoke with Philip, who had relocated to Alakanuk, several times on the telephone to discuss the family case plan and safety threats in the home such as domestic violence and substance abuse. Leahu also suggested services but Philip refused. Philip responded that he wanted time to contact his attorney and that he or his attorney would contact Leahu. Philip did not contact Leahu. Leahu and Philip's attorney spoke once, but the attorney mainly questioned the need for certain provisions within the plan. Leahu testified that "[w]hen you have a parent denying anything on a case plan, it's difficult to move on." Leahu suggested that Philip get an assessment at the local behavioral clinic. Although Philip agreed to get an assessment, he did not make an appointment.

The Tribe similarly recommended that the children, Georgina, and Philip participate in a psychological assessment. The Tribe also suggested that Philip get a sexual abuse assessment. OCS next began coordinating for the family to meet with specialist Dr. Bruce Smith in St. Mary's for a comprehensive evaluation to identify an appropriate treatment plan.

---

[26] Following removal Georgina twice called OCS asking when the children would be returned to her. On both occasions, the OCS supervisor explained that Georgina needed to engage in services for substance abuse and domestic violence. During the first call, Georgina said she didn't need anything and was fine. On the second call, Georgina uttered obscenities and hung up on the supervisor.

Around June 2010 Georgina moved to Alakanuk to be with Philip even though the children were still living in Mountain Village. The next month, Georgina was admitted to the emergency room at the Yukon-Kuskokwim Health Corporation with severe injuries. She had contusions and abrasions all over her body, including a laceration on her head that required stapling. The x-rays indicated that both her arms were broken; there was one clean break and at least one place where the bone was broken into multiple small pieces. She was transferred to the Alaska Native Medical Center in Anchorage where she had surgery on the arm fractures. Her x-rays also revealed that she had old rib fractures that were healing. The Yukon-Kuskokwim Health Corporation emergency room doctor testified that "[s]he was most likely assaulted with a stick, bat or other striking object" based on "the nature of the bruises." Philip stated that he had found her injured in their boat, but he did not report the incident to the police.[27] The Alaska Native Medical Center filed a report of concern to OCS for Georgina's children based on the assault, indicating that Georgina would not identify her assailant. After her release from the hospital, Georgina moved back to Alakanuk to be with Philip. The children remained in the custody of their grandmother.

OCS next assigned social worker Debra Westdahl to the case, and she made referrals for Georgina, Philip, and their three oldest children to get comprehensive psychological assessments in St. Mary's with Dr. Bruce Smith. She also arranged for both parents to travel to St. Mary's for the assessments and for the children to travel so the family could have visitation. The parents did not show up to the assessment or visitation. Nonetheless, Dr. Smith conducted assessments of Sophie, Anne, and John. Dr. Smith also made recommendations about visitation and case planning based on his

___

[27] Philip informed medical authorities about his boat story and testified to it before the superior court. The superior court found Philip's "version of these facts to be unbelievable."

review of the parents' records. Dr. Smith recommended that the children remain in the custody of their grandparents and that they have no contact with their father until an assessment and treatment recommendations were complete. Dr. Smith observed that "[t]here appear[ed] to be an escalating pattern of harm to Georgina which if left uninterrupted can lead to continued battery and even homicide." He also recommended that both parents receive substance abuse counseling.

Westdahl met twice in person and three times telephonically with Philip and Georgina in Alakanuk between August and November 2010 to discuss case planning. The November 2010 case plan indicates that during these meetings Philip "refused to engage in any discussion regarding the current case plan. He stated that he needed to consult his attorney before he could participate in the case plan." The case plan further described a teleconference between Philip, his attorney, the social worker, and OCS's attorney during which his attorney "disputed each and every element of the case plan."

The case plan also noted the scheduled assessment for Philip with Dr. Smith in August 2010 and directed Philip to complete Dr. Smith's recommendations to address substance abuse, sexual abuse, anger management, domestic violence, and parenting. The case plan further directed Philip to take classes at the Yukon-Kuskokwim Health Corporation to address those issues. The case plan did not permit visitation between Philip and the children, based on Dr. Smith's earlier recommendation. Westdahl arranged for visitation between Georgina and the children. They had three visitations between August and November 2010.

## D.     Alyssa Is Removed

In February 2011 the superior court adjudicated the seven oldest children as children in need of aid.[28]  At the time, Georgina was pregnant with Alyssa and still residing with Philip.  Westdahl met with them and tried to prevent Alyssa's removal upon her birth explaining "that families have been through the same that they've been through . . . and . . . have worked through it and . . . been reunified."  The parents had not completed any steps in their case plan and would not agree to services.

Alyssa was born in March 2011.  Six weeks later OCS filed an emergency petition for adjudication of a child in need of aid and for temporary custody, reporting that the parents "have refused for one year to engage in a case plan to reunify with their 7 other children" and that Alyssa was at risk because the safety threats were unmitigated.  When OCS removed Alyssa, Westdahl again asked the parents to participate in services.  Philip and Georgina refused and instead stated that they would speak to their counsel.  After the removal, OCS placed Alyssa with Edna and Alyssa's siblings in Mountain Village.

## E.     OCS Involvement After Alyssa's Removal

OCS continued to make efforts to assist the family after Alyssa's removal.  Westdahl visited Alyssa at Edna's home on a monthly basis and coordinated and supervised visits between all eight children and both parents.  Westdahl also coordinated family travel to the supervised visitation in St. Mary's.  During the termination trial,

---

[28]     The superior court adjudicated all seven of the children as children in need of aid based on physical harm, substantial risk of mental injury due to domestic violence, and neglect.  The superior court also found that the female children were children in need of aid based on sexual abuse, but the parties stipulated to vacate that finding.  *See Philip J.*, 264 P.3d at 846 n.7.

Westdahl arranged for three supervised visitation sessions, including transportation, between both parents and the five younger children.[29]

During the termination trial in July 2011, Philip expressed interest in participating in a behavioral assessment, and Westdahl scheduled another assessment for Philip and Georgina with Dr. Smith.[30] During the assessment Philip denied excessive substance use and domestic violence issues. Dr. Smith diagnosed Philip with "alcohol-dependence, episodic pattern." And Dr. Smith explained that if Philip "has consumed alcohol to the point of intoxication, that increases that moderate-to-high risk of violence." Dr. Smith recommended several services for Philip[31] and the establishment of a safety plan to ensure the children are not alone with Philip until he addresses his problems. Dr. Smith testified that an intensive outpatient program or a residential program with community aftercare would be appropriate to address Philip's needs.

In November 2011 Philip contacted a behavioral health aide in Alakanuk in response to a court order to receive services. The aide requested a copy of his recent assessment and later reminded Philip to provide one, but Philip did not submit the assessment information and did not attend any sessions. And between late 2011 and early 2012, the case was assigned two new social workers. The new social workers visited Alyssa and arranged visitation but apparently did not discuss the case plan with the parents.

---

[29]     Georgina was also able to visit Sophie and Anne in Mountain Village.

[30]      Westdahl arranged visitation in St. Mary's during the same trip.

[31]     Substance abuse counseling, counseling to address his "inappropriate boundary violations as it relates to his daughters," parenting classes to help him understand his children's developmental needs, and a batterer's intervention program.

Social worker Deborah Cramer was assigned to the case in late 2011. During her work on the case, she updated the case plans, facilitated and supervised visitation in St. Mary's and in Alakanuk, provided resources including food and dry goods, gave the family phone cards, and referred the parents to services, including substance abuse treatment, domestic violence counseling, anger management counseling, and parenting classes, but Philip declined to participate. Cramer still provided referrals for batterer's intervention, domestic violence, anger management, substance abuse, inappropriate sexual behavior, and parenting classes. In addition, Cramer referred Georgina and Philip to "a culturally appropriate, Yup'ik-oriented, four-to-five-day workshop" run by the Association of Village Council Presidents. Philip and Georgina initially refused but later participated in the program.

Philip participated in a substance abuse assessment. Cramer arranged transportation for Philip to go to this assessment in Emmonak, and Cramer facilitated the clinician's agreement to work with Philip on this and other issues. Philip refused additional sessions, and thus Cramer did not make further travel arrangements.

On June 29, 2012, the superior court issued a written order terminating Philip's and Georgina's parental rights to the seven oldest children.[32] The superior court determined that the children were in need of aid under AS 47.10.011(6) (risk of physical harm), (8)(A) (mental injury), (8)(B)(i)-(ii) (risk of mental injury, particularly due to domestic violence), and (10) (substance abuse). The superior court also found that OCS had made active efforts in its attempts to motivate the parents who "without justifiable

---

[32] Also in late June, Georgina gave birth to Pete. Cramer met with the parents and encouraged Georgina to go to a treatment program that would allow her to stay with Pete, but she refused. Later Georgina moved to Mountain Village to live with Pete and was provided with a safety plan and encouraged to engage in services.

cause failed to participate in a suitable place or program designed to reunite the parents with their children."

On November 6, 2012, the superior court issued findings in Alyssa's case, relying on the evidence presented during the older children's case. The superior court found that OCS had made active efforts to provide remedial and rehabilitative services designed to prevent the breakup of the Indian family, including: substance abuse assessment and treatment, mental health assessment and counseling, transportation assistance to attend services, team-decision-making meetings, parenting classes, anger management assessment and classes, efforts to locate parents, developing and updating a case plan, domestic violence counseling, and family visitation.

On November 14, 2012, the superior court issued its termination order, finding that Alyssa was a child in need of aid under AS 47.10.011(1) (abandonment), (6) (risk of physical harm), (8)(B)(i)-(ii) (risk of mental injury, particularly due to domestic violence), (9) (neglect), and (10) (substance abuse). The superior court further found that OCS had made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts had been unsuccessful. The superior court commended OCS social worker Cramer's "excellent efforts" and found also that "OCS and the tribe made excellent efforts to support the grandparents who took on the job of raising all these children." Finally, the superior court noted that its decisions rested strongly on "the parents' utter refusal to work their case plans over these years, including the time Alyssa has been in custody."

## III. STANDARD OF REVIEW

Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact.[33] We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA.[34] Additionally, we review for clear error the superior court's factual determinations as to whether the State met its evidentiary burden in showing that a child is in need of aid.[35]

" 'Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves [this court] with a definite and firm conviction that a mistake has been made.' "[36] We will not reweigh evidence when the record provides clear support for the superior court's decision.[37]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Provide Services And Programs To Reunify This Indian Father With His Seven Oldest Children.

In a termination proceeding involving Indian children, the superior court must find, by clear and convincing evidence, that the State has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup

---

[33] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[34] *Id.*

[35] *Id.*

[36] *Id.* at 269-70 (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 209-10 (Alaska 2010)).

[37] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

of the Indian family and that those efforts were unsuccessful.[38] The court conducts an active efforts inquiry on a case-by-case basis because "no pat formula" exists for distinguishing between active and passive efforts.[39] We look " 'to the state's involvement in its entirety' " when reviewing a finding of active efforts.[40]

In general, active efforts will be found when OCS " 'takes the client through the steps of the plan rather than requiring that the plan be performed on its own,' "[41] but not when "the client must develop his or her own resources towards bringing [the plan] to fruition."[42] In assessing whether OCS met the active efforts requirement, "a court may consider 'a parent's demonstrated lack of willingness to participate in treatment.' "[43] Active efforts are required even if the parent is incarcerated but may include programs offered by the Department of Corrections and the efforts made by a parent's parole officer.[44]

---

[38] 25 U.S.C. § 1912(d) (2012); *see also* CINA Rule 18(c)(2)(B).

[39] *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

[40] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[41] *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001) (quoting *A.A.*, 982 P.2d at 261).

[42] *Lucy J.*, 244 P.3d at 1114 (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[43] *Id.* (quoting *Maisy W.*, 175 P.3d at 1268); *Wilson W.*, 185 P.3d at 101-02.

[44] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 (Alaska 2009); *see Dashiell R. v. State, Dep't of Health & Soc. Servs.,* (continued...)

Here the superior court determined that "OCS . . . met its burden [to demonstrate] that there have been active efforts to provide remedial services designed to prevent the breakup of the . . . family which have remained unsuccessful." The superior court found that OCS's efforts included: (1) family case planning in 2005 before the Tribe requested that the case be closed; (2) twice offering to transport Georgina and the children to a shelter "to escape Philip"; (3) efforts "to provide substance abuse treatment and mental health counseling to the parents"; and (4) "a case plan [in 2005 and 2010] that included domestic violence counseling or classes." The superior court relied substantially on the parents' failure to participate in a suitable plan or program designed to reunite the parents with their children. The superior court found that this refusal rose to the level of abandonment as defined in AS 47.10.011(4).[45]

Philip challenges the superior court's findings as to active efforts, arguing: (1) that the superior court failed to make findings as to the efforts of particular social workers and that the efforts of social workers Westdahl and Leahu were inadequate; (2) that OCS failed to make referrals for a batterer's intervention program or substance abuse evaluation; (3) that OCS should have sought a court order to compel Philip to attend psychological and behavorial assessments; (4) that he was willing to participate

_____

[44](...continued)
*Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[45]     It appears that the superior court's findings include a typographical error. The cited statute section, AS 47.10.011(4), provides that a court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that "the child is in need of medical treatment to cure, alleviate, or prevent substantial physical harm or is in need of treatment for mental injury and the child's parent, guardian, or custodian has knowingly failed to provide the treatment." But AS 47.10.011(1) states that a child is a child in need of aid if "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter."

in services, contrary to the superior court's finding; and (5) that he was justifiably reluctant to participate in the assessments with Dr. Smith due to self-incrimination concerns.[46]

### 1. The findings regarding the efforts of social workers

Philip challenges the superior court's findings, suggesting that it was necessary for the court to address each element of the case plan and each social worker separately. Specifically, Philip claims that social worker Westdahl did not refer him to anger management, domestic violence, or batterer's programs, and that she did not provide him with specific information about the other referrals. Philip further claims that social worker Leahu's efforts were passive because Leahu suggested that Philip seek an assessment from a local behavioral health clinic in Alakanuk but did not set up an appointment for him. Philip also argues that "[t]here were no active efforts by the social workers after the referral to Dr. Smith" in August 2010.

The superior court was not required to make particular findings as to each social worker or each component of the case plan. Rather, the superior court may consider "the state's involvement in its entirety" in evaluating active efforts.[47] And inadequate efforts in one period of state involvement do not render the entirety of the state's efforts inadequate, even when that period lasts for a matter of months.[48]

---

[46]     Although Philip also refers to several other issues in his points on appeal for S-14810, these issues are waived on appeal because he did not brief them. *Hymus v. DeRamus*, 222 P.3d 874, 885 n.42 (Alaska 2010).

[47]     *Lucy J.*, 244 P.3d at 1114 (quoting *Maisy W.*, 175 P.3d at 1268); *see also Roland L. v. State, Office of Children's Servs.*, 206 P.3d 453, 456 (Alaska 2009) (stating that OCS's acknowledged failure of active efforts during three months did not determine the outcome of the case, including 26 months of total involvement).

[48]     *Maisy W.*, 175 P.3d at 1268-69 (three-month failure of active efforts did not
(continued...)

Importantly, "a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[49] And we have excused "further active efforts once the parent expresses an unwillingness to participate."[50]

The superior court's consideration of OCS's efforts spanned involvement from 2004 through the termination trial in 2011. The superior court found that the scheduled assessment for the oldest children and the parents, the parents' decision not to attend that assessment, the social workers' attempts "to motivate the parents to engage in their case plan," and the parents' "lack of performance" demonstrated that active efforts were made. The superior court also cited several OCS efforts in the facts section of its decision, including family case planning in 2005; offers to transport Georgina and the children to a shelter for domestic violence victims;[51] efforts to provide substance abuse treatment and mental health counseling; and the development of a case plan recommending domestic violence classes. Because the superior court may consider the

---

[48](...continued) preclude termination of ICWA parent's rights when OCS made substantial efforts during three years); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (seven-month failure of active efforts over several years of OCS involvement with family did not preclude termination of ICWA parent's rights when parent was uncooperative once active efforts began again).

[49]    *Maisy W.*, 175 P.3d at 1268 (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)); *see Lucy J.*, 244 P.3d at 1114.

[50]    *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008).

[51]    OCS made this offer to take Georgina and the children to a domestic violence shelter on two separate occasions.

state's efforts comprehensively, this finding is adequate, and there is no need for specific findings about each social worker.

Philip's interactions with both of the social workers whose efforts he challenged highlight his refusal to engage with services. Westdahl testified that she did not make referrals for Philip because he repeatedly declined her offers for services and refused outright to participate in assessments. Westdahl twice traveled to Alakanuk and encouraged Philip and Georgina to access services, and they twice refused.[52] Social worker Leahu had experienced the same reluctance from Philip, despite speaking with both Philip and Philip's attorney about accessing local services. Despite Leahu's referrals for Philip to participate in offered services, Philip failed to make or attend appointments. OCS did organize and schedule specific assessments for Philip in August 2010 with Dr. Smith[53] and again in October 2011 when Philip expressed interest in services in his trial testimony.

Finally OCS was not unreasonable in its approach of postponing some treatment decisions until the parents had completed a psychological assessment.[54] OCS

---

[52]    When Philip later agreed to an assessment during the termination trial, OCS organized another assessment in October 2011.

[53]    This was the first scheduled appointment with Dr. Smith, which Philip missed. Philip contends that his reluctance to meet with Dr. Smith stemmed from self-incrimination concerns because "OCS wanted Dr. Smith to question [Philip] without an attorney present, about sexual assaults and sexual abuse of minors." But Philip relegates this argument to four sentences in his brief and cites no legal authority in support of his claim. Because a "single conclusory paragraph without citation of any authority . . . is not adequate to put the issue before the court," we need not consider Philip's contention. *Fairview Dev., Inc. v. City of Fairbanks*, 475 P.2d 35, 36 (Alaska 1970).

[54]    *See Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) ("OCS reasonably decided to put off Pravat's

(continued...)

workers testified that they had "asked for assessments so that [they] could get recommendations for the case plan to help the parents" and that they had "wanted an expert, someone like Dr. Smith, who could assess this family and tell [them] exactly what was needed." Philip contends that efforts were not made after 2010, but he fails to appreciate the impact of his constant refusal to engage with services, including missing the 2010 appointment with Dr. Smith.

As found by the trial court and supported by the record, over a period of seven years, OCS made active efforts to provide Philip with the services necessary for the retention of and reunification with his children. The superior court's findings and conclusions were not error.

2. **Lack of referral for a batterer's intervention program or a substance abuse evaluation in Bethel**

Philip also argues that OCS's efforts were inadequate because he did not receive a referral for a batterer's intervention program even though a case worker had suggested that he should participate in such a program.[55] Philip also claims that the social workers "did not make a referral [for a] substance abuse evaluation either locally

---

[54](...continued) participation in parenting, anger management, and Fetal Alcohol Spectrum Disorder classes until after he completed a psychological assessment" even though there was a delay in scheduling the assessment.).

[55] The expert in social work testified that OCS had sought an assessment to determine if Philip needed a batterer's intervention program and that she believed anger management class would address a different issue.

or in Bethel." But OCS is not required to refer a parent to specific support programs,[56] and OCS's actions were not deficient in this respect.

We have upheld an active efforts finding where OCS delayed efforts in order to obtain evaluation of a parent.[57] At trial an expert in social work testified that Philip "need[ed] an assessment to get into a batterer's intervention program," which is why OCS had not offered Philip that particular program. Several witnesses also explained that OCS was waiting to get recommendations from a comprehensive assessment before referring Philip to particular programs. Philip's lack of cooperation and failure to acknowledge his problems extended the time during which he was not referred to services.[58] Thus, the superior court did not err in its consideration of OCS's efforts with respect to a batterer's program. OCS's efforts must be examined in their entirety, and the failure to provide a referral to one program in a case plan does not necessarily undermine those efforts as a whole.[59]

With respect to substance abuse counseling, OCS arranged for a comprehensive assessment in St. Mary's, which would have included an evaluation of Philip's substance abuse issues. OCS also made referrals to behavioral aides who could

---

[56]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1115 (Alaska 2011) (stating that "[a]ny argument" that the mother should have been referred to a specific plan was "simply not persuasive").

[57]     *See Pravat P.*, 249 P.3d at 272.

[58]     *See id.* (acknowledging in a situation where evaluation was also needed that a "lack of cooperation . . . excuse[d] minor faults in OCS's efforts"). In *Pravat P.*, the evaluation needed to begin services was pushed off for nine months. *Id.* at 267.

[59]     *Lucy J.*, 244 P.3d at 1114.

have addressed substance abuse in their counseling.[60]  Philip's contention is therefore inconsistent with the record.

### 3.    OCS's decision not to seek a court order

Philip contends that OCS "could have sought and obtained a court order for the evaluations," relying on *Alyssa B. v. State, Department of Health & Social Services.*[61] But the question in *Alyssa B*. was whether it was an abuse of discretion for the superior court to order Alyssa to undergo a psychological evaluation in a child in need of aid proceeding in light of Alaska CINA Rule 16(b) and Alaska Civil Rule 35(a).[62]  *Alyssa B*. does not answer the question whether OCS is required to seek a court order to demonstrate active efforts.[63]  In *Wilson W. v. State, Office of Children's Services*, we suggested that "requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system."[64]  Here, the fact that OCS could have done more does not undermine the other active efforts that

---

**60**      Philip points to the efforts in *Jon S. v. State, Department of Health & Social Services, Office of Children's Services*, 212 P.3d 756 (Alaska 2009), noting that the case plan in *Jon S*. involved a "referral for a substance abuse assessment."  *Id.* at 766 n.38. But the case plan in this case did include referral to substance abuse counseling.  Philip was simply uncooperative and resistant to accessing services.  The fact that Philip never received substance abuse counseling does not render the superior court's finding erroneous.

**61**      123 P.3d 646, 650 (Alaska 2005).

**62**      *See id.* (concluding that CINA Rule 16(b), which allows a court to order mental and physical examinations of a child's parents at the predisposition phase of a CINA proceeding, does not limit the court's authority under Alaska Civil Rule 35(a) to order a mental examination at the adjudication stage).

**63**      *Id.* at 650-51.

**64**      185 P.3d 94, 102 (Alaska 2008).

OCS made. "[T]he active efforts requirement does not require perfection."[65] Additionally, there was no evidence that a court order would have compelled Philip to accept services, as he did not follow past court orders for treatment. The superior court's finding that the social workers "attempted to motivate the parents to engage in their case plan to no avail" was supported by substantial evidence, and it did not clearly err by finding active efforts in the absence of an OCS initiated court order to force Philip to participate in his case plan.[66]

### 4. The superior court's consideration of Philip's lack of willingness to participate in services

Philip argues that the superior court erred in finding that he was unwilling to participate in services. The superior court found that there was clear and convincing evidence that the State made active efforts "[b]ased on the parents' lack of performance and [the] State[']s efforts to engage the parents." In particular, the superior court cited the parents' failure to attend the 2010 assessments with Dr. Smith and their refusal to work on their case plan "[e]ven while being advised that they could lose custody of their yet to be born child." In another portion of its decision, the superior court agreed with an OCS worker that "17 months has been enough time for the parents to at least begin their case plan."

The trial judge may consider "the willingness of the parent to complete the steps necessary for reunification in evaluating whether OCS met the active efforts

---

[65] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[66] *See K.N. v. State*, 856 P.2d 468, 477 (Alaska 1993) (citing *In re Brown*, 736 P.2d 1355, 1358 (Idaho 1987)) (concluding that, although the State could have done more, it is unlikely that further efforts would have been effective in light of the father's attitude).

requirement."[67] A parent's lack of cooperation with a case plan may indicate that further efforts by the State are unlikely to be effective.[68] For instance, "[i]f a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile."[69] In *A.A. v. State*, we upheld a finding of active efforts even though the State had failed to develop a case plan, because A.A. had exhibited a lack of willingness to engage in treatment.[70] And in *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*, we affirmed the superior court's active efforts finding, citing Lucy's failures to complete steps in her case plan or attend meetings arranged by OCS.[71] Similarly in *David S. v. State, Department of Health & Social Services, Office of Children's Services*, we cited a father's refusal to speak with his OCS worker as undermining his argument

---

[67]     *Wilson W.*, 185 P.3d at 101 (citing *K.N.*, 856 P.2d at 477); *see also Lucy J., Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1117 (Alaska 2011) (noting evidence of "Lucy's repeated failures to complete the elements of her case plan, engage in meaningful substance abuse treatment, and show up for meetings that OCS had arranged for her"); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) (noting other cases that allow a parent's willingness to cooperate to be considered in deciding whether the State has made active efforts); *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001) (stating that the parent's decision to leave a treatment program before completion indicated that there was no reason to believe that attempting another treatment program would have had a successful impact); *A.A. v. Dep't of Family & Youth Servs.*, 982 P.2d 256, 262 (Alaska 1999).

[68]     *Wilson W.*, 185 P.3d at 101.

[69]     *Id.* (citing *K.N.*, 856 P.2d at 477).

[70]     982 P.2d at 262.

[71]     244 P.3d 1099, 1117 (Alaska 2010).

that OCS should have made additional efforts to arrange visitation for the following month.[72]

There were repeated instances when Philip declined to participate in services. In April 2010 a court order in his criminal case required Philip to participate in "[i]ntegrated treatment, mental health, [and] alcohol counseling." The order referred him to a local clinic. The behavioral health aide trainee testified that Philip "called to make an appointment, but when the appointment came he failed to appear to his scheduled appointment."

Leahu similarly testified that when he worked with the family from May to around July 2010, Philip "didn't want to work a case plan with me." Still, Leahu began arranging the assessment with Dr. Smith. Leahu also discussed the case plan with Philip and his attorney and coordinated transportation for Anne to Bethel when she got sick.

Westdahl described OCS's many efforts in the summer of 2010, including setting up transportation and lodging for the parents and children in St. Mary's, scheduling the assessments for both parents and the three oldest children, and arranging visitation. The parents canceled on the day they were scheduled to go to St. Mary's. Westdahl also testified that she met with and spoke to the parents on the phone several times to develop the case plan from 2010 to 2011. Although Westdahl continued to offer an assessment to Georgina and Philip, "[t]hey refused," told Westdahl they would speak with counsel about the offer, and never called Westdahl back. Westdahl reported that she continued to remind both parents about their case plan. Yet Philip did not compete

---

[72] 270 P.3d 767, 778 (Alaska 2012) ("[Father's] refusal to speak with [his case worker] on October 1 undermines his argument that OCS should have arranged more than three visits between October 1 and the beginning of the termination trial in November.").

any of his case plan while Westdahl was assigned to the case. And both parents refused to acknowledge the family's problems, indicating that further efforts were unlikely to be effective.[73]

Philip points to some evidence that he was willing to participate in services, including his completion of classes while incarcerated in July 2005 and his meeting with a behavioral aide on two occasions in Mountain Village following his release. But we will only overturn the superior court's finding if we have a definite and firm conviction that a mistake has been made,[74] and our examination of the record confirms that the superior court did not err in finding Philip uncooperative. Its reliance on that finding in the active efforts analysis was also appropriate.

**B.    The Superior Court Did Not Err In Finding That Alyssa Was A Child In Need Of Aid.**

Philip first challenges the superior court's findings under AS 47.10.011 that Alyssa was a child in need of aid. He indicates that OCS's concerns about future risks to Alyssa were insufficient to support removal.

In a termination proceeding, AS 47.10.088(a)(1) requires the superior court to find, by clear and convincing evidence, that a child has been subjected to conduct or conditions described in AS 47.10.011. Here the superior court found that OCS presented clear and convincing evidence that Alyssa had been exposed to conduct or conditions listed in several subsections of AS 47.10.011: (1) (abandonment), (6) (physical harm), (8)(B)(i)-(ii) (mental injury or risk of mental injury, particularly as a result of exposure

---

[73]    *See K.N.*, 856 P.2d at 477 (taking into account the father's denial of mental problems and resistance to State intervention in concluding that active efforts were made).

[74]    *See Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269-70 (Alaska 2011).

to domestic violence), (9) (neglect), and (10) (substance abuse). Only one statutory basis is required for a finding that a child is in need of aid.[75]

We have explained that "the state is not required to wait to intervene until a child has suffered actual harm"[76] and that the statute "contemplate[s] an analysis of future harm."[77] In *Martin N. v. State, Department of Health & Social Services, Division of Family & Youth Services*, the father's past acts of violent behavior toward the mother, including reckless use of a firearm, were sufficient to support the finding that there was a present risk of harm.[78] The superior court's findings in this case relied largely on Philip's past record of unmitigated substance abuse and domestic violence. We need not address all statutory bases found by the superior court to affirm the superior court's finding that Alyssa was a child in need of aid. Here we conclude that the superior court did not err in finding that Alyssa was a child in need of aid due to Philip's domestic violence and his substance abuse.

---

[75] *See* AS 47.10.011 ("[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following . . . ."); *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009).

[76] *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54 (Alaska 2003) (citing *O.R. v. State, Dep't of Health & Soc. Servs.*, 968 P.2d 93, 98 (Alaska 1998)).

[77] *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 348 (Alaska 2006) (quoting *Martin N.*, 79 P.3d at 55) (discussing AS 47.10.011(8)(B)).

[78] *Martin N.*, 79 P.3d at 54.

1. **Mental injury or risk of mental injury as a result of exposure to domestic violence**

Under AS 47.10.011(8)(B)(i) and (ii), the superior court may find a child to be a child in need of aid if it finds that the conduct of the parent has placed the child at substantial risk of mental injury as a result of exposure to domestic violence. This court has held "that domestic violence in the home, even if not committed against the children, poses a high risk of mental injury."[79]

The superior court found that Alyssa was "at substantial risk of mental injury as a result of a pattern of terrorizing, isolating, or corrupting behavior that will, if continued, result in mental injury."[80] The superior court further found that the parents' conduct placed Alyssa "at substantial risk of mental injury as a result of exposure to domestic violence and repeat domestic violence."[81]

Although Philip attests that "[t]here was no indication during Alyssa's life that [Philip] beat up [Georgina]," we have observed that the statute accounts for future harm based on one parent's past abuse of the other parent.[82] "[W]itnessing domestic

---

[79] *Sarah G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 264 P.3d 831, 834 (Alaska 2011) (citing *Winston J.*, 134 P.3d at 348) (holding that a mother's past pattern of dangerous behavior was evidence enough to find her children in need of aid under AS 47.10.011, even though the behavior was not going on at the time of the petition).

[80] *See* AS 47.10.011(8)(B)(i).

[81] *See* AS 47.10.011(8)(B)(ii).

[82] *Winston J.*, 134 P.3d at 348 (holding that prior domestic violence by a father against a child's mother allows a superior court to find a risk of mental injury to the child).

violence is mentally harmful to children."[83] Philip's pattern of domestic abuse against Georgina, including the most recent violent incident in 2010 when he broke both of her arms, is sufficient to support the finding that intervention was appropriate. The State was not required to wait until Alyssa suffered harm to act.[84] The superior court's finding is thus not clearly erroneous.

### 2.    Substance abuse

Alaska Statute 47.10.011(10) allows a court to find that a child is in need of aid if the "parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." The superior court here found by clear and convincing evidence that Philip's substance abuse met that standard with respect to "the children including Alyssa." The superior court based its finding on "the prior adjudication under this subsection in 2005, the parents' refusal to follow substance abuse recommendations, and [Philip's] continued use of alcohol that leads [to] escalation of his violence."

Philip maintains that there was no evidence of active substance abuse. But the superior court relied on the many severe and violent incidents involving alcohol to reach its conclusion under this subsection, including an incident when Philip fired a shotgun in the home while drinking; an incident when Philip assaulted a houseguest during a bout of drinking; and an incident when Philip was convicted of alcohol-related crimes. The superior court also noted that Philip had not followed through with treatment for his substance abuse. Despite referrals by numerous social workers, Philip

---

[83]    *Id*. (quoting *Martin N.*, 79 P.3d at 55).

[84]    *See Martin N.*, 79 P.3d at 54 (citing *O.R. v. State, Dep't of Health & Soc. Servs.*, 968 P.2d 93, 98 (Alaska 1998)).

has not participated in a full course of substance abuse counseling since 2006. Because these findings are supported by Philip's criminal convictions and the extensive testimony from OCS case workers, the superior court did not clearly err in finding that Alyssa was a child in need of aid due to Philip's substance abuse.

C. **The Superior Court Did Not Err In Determining With Respect To Alyssa That OCS Made Active Efforts To Keep The Indian Family Together.**

Philip contends that OCS failed to make efforts with respect to several specific treatment programs identified in his case plan and generally after his 2012 assessment by Dr. Smith. He also argues that the superior court clearly erred in finding him unwilling to participate in services.

The superior court found that OCS made "excellent efforts" to prevent the breakup of the Indian family with regard to Alyssa. The superior court relied on social worker Cramer's testimony, which it found to be "compelling and credible," and took into account "the development of safety plans, case plans, referrals for assessments, assessments, travel arrangements to receive assessments and to participate in visitation, meeting with the parents, and recommendations and encouragement to participate in recommended treatment."

In assessing whether active efforts have been made under ICWA,[85] the superior court may consider all services provided during a family's involvement with OCS.[86] Thus, with respect to Alyssa, the superior court properly considered OCS's efforts toward the seven oldest children.

---

[85]     25 U.S.C. § 1912(d) (2006).

[86]     *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188-89 (Alaska 2009).

Philip maintains that OCS's efforts in offering referrals to sexual offender treatment, substance abuse treatment, batterers' intervention programs, and the Healthy Families Program were inadequate. But OCS has discretion in determining what efforts to pursue based on the case plan and the parent's needs.[87] Furthermore, as discussed with regard to OCS's efforts in the case involving the seven oldest children, "a court may consider 'a parent's demonstrated lack of willingness to participate in treatment' " in its active efforts assessment.[88]

Philip contends that he was never referred to counseling to address his inappropriate boundary violations, despite a recommendation by Dr. Smith for such services. Philip also challenged the adequacy of OCS's efforts related to substance abuse, which included a referral in 2012 for residential substance abuse treatment. He suggests that Cramer's "generic referral to YK Behavior Health" was insufficient and that she should have taken additional steps to locate a specific batterer's intervention program. And he suggests that OCS should have better facilitated access to Healthy Families.

But Cramer testified that when she referred Philip to the Yukon-Kuskokwim Health Corporation, she specifically requested parenting classes and services to address domestic violence, anger management, substance abuse, and inappropriate sexual behavior. She also testified that while Philip attended a substance abuse assessment in Emmonak and the counselor agreed to address additional problems, Philip did not continue to attend counseling appointments. Cramer referred Philip and

_____

[87] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1115 (Alaska 2010) (stating that "[a]ny argument" that the mother should have been referred to a specific plan was "simply not persuasive").

[88] *Id.* at 1114 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* 175 P.3d 1263, 1268 (Alaska 2008)).

Georgina to Healthy Families in May 2012, but Philip refused to comply. Despite that refusal, Cramer persisted in her recommendation during the termination trial, and Philip eventually attended and completed Healthy Families only after the conclusion of the hearing.

Philip contends that "OCS dug in their heels and stopped active efforts" after Philip met with Dr. Smith. This argument is undermined by trial testimony suggesting that after Philip participated in his assessment with Dr. Smith, Cramer referred him to the behavioral health clinic at the Yukon-Kuskokwim Health Corporation despite his outright refusal to participate in treatment. The superior court did not err in finding that active efforts were made given Cramer's efforts and Philip's reluctance.

Cramer testified that she "basically begg[ed Philip] to work his case plan," and that despite her many referrals, he "flatly" refused. Although she did not fill out additional forms to provide access to services that Philip had already refused, this choice was reasonable given Philip's long-standing reluctance or refusal to participate in treatment. Given that Cramer made significant effort to engage Philip with services and that we have excused "further active efforts once the parent expresses an unwillingness to participate,"[89] the superior court did not err in finding that Cramer provided "excellent efforts" in the face of general reluctance by Philip or in deciding that active efforts had been made in this case.

Philip also challenges the superior court's finding that he was not willing to participate in services and treatment. He argues that his participation in a substance abuse evaluation and his deposition responses[90] demonstrate his willingness to participate

---

[89] *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008).

[90] It is unclear whether the content of Philip's deposition was admitted into (continued...)

in services and that fault lies with the social workers who "failed to make the proper referrals."

Westdahl and Cramer both testified that Philip consistently declined their offers to provide services, and the superior court found that Cramer made "excellent efforts." We do "not reweigh evidence when the record provides clear support for the superior court's ruling."[91]

## V.    CONCLUSION

We AFFIRM the superior court's orders terminating Philip's parental rights to his children Sophie, Anne, John, Katherine, Nellie, Olivia, Alexandra, and Alyssa.

---

[90](...continued) evidence. At trial, in response to objection, the court responded that "I'm going to have [the deposition] played. I'm not sure if I'm going to admit, but at least . . . it'll be a part of the record." The deposition was played, but the judge never ruled on its admissibility. In the relevant portion of the deposition, dated July 16, 2010, Philip states that he would be willing to get counseling.

[91]    *Maisy W.*, 175 P.3d at 1267 (citing *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000)).