STOWERS, Justice.
I. INTRODUCTION
This case involves the termination of a father's parental rights to his only daughter. The father had not been a substantial part of his daughter's life when the Office of Children's *733 Services (OCS) took custody of her from her mother. The father was coping with his own mental health, substance abuse, and post-traumatic stress disorder (PTSD) issues when this case began and was receiving services to address those issues. OCS facilitated some visitation between the father and the daughter, encouraged the father to continue participating in the services he was already receiving, and added parenting classes to the regimen. By all accounts, the father was making progress. But while the case was ongoing, OCS received a report that the father had sent nude photos of his genitals to a minor female. OCS referred the father for a sex offender assessment and his history of other sexual misconduct came to light. Upon receiving the assessing psychologist's conclusions that the father was a risk to his daughter's safety, OCS moved forward with terminating his parental rights. The superior court terminated the father's rights after a two-day trial. He appeals, arguing only that OCS failed to make active efforts. Because the record demonstrates OCS made active efforts to reunify the father and his daughter, we affirm the superior court's termination of the father's parental rights.
II. FACTS AND PROCEEDINGS
A. Background
Sam M. and Julia J. are the biological parents of Lane J.[1] Lane is an Indian child as defined by the Indian Child Welfare Act (ICWA) based on Julia's affiliation with the Native Village of Kluti-Kaah.[2] Julia relinquished her parental rights to Lane and her two other children prior to the termination trial. This appeal only involves the termination of Sam's parental rights to his daughter Lane.
Julia conceived in January 2010 after a single sexual encounter with Sam. Sam was unaware that he had a daughter until she was over a year old. After Sam learned about his daughter, he was able to see her every few months until she was three years old. At this point Sam and his father, with whom he lived at the time, filed for custody of Lane because Julia's stepmother informed Sam that Julia was taking drugs. Directly after Sam filed for custody, Julia left Alaska with the children and relocated to Washington for approximately three years. The custody case lapsed, and Sam did not see his daughter again until 2016, after Julia returned to Alaska.
In August 2016 OCS responded to a report that Julia was neglecting Lane and her two other children and using methamphetamine. Julia admitted to using methamphetamine, and OCS took emergency custody of the children. OCS filed an emergency petition to adjudicate the children as children in need of aid (CINA) under AS 47.10.011(6) (risk of physical harm), (9) (neglect), and (10) (substance abuse). At the time OCS filed its emergency CINA petition, Julia was homeless and OCS had trouble getting contact information for Sam. The children were all placed with foster parents. Lane and her younger brother were placed with their maternal aunt, where they have remained since OCS took custody. Julia's stepmother contacted Sam on Facebook after OCS took custody of the kids and advised him that Julia and Lane had moved back to Alaska.
Lane is currently eight years old. She has been diagnosed with autism and may suffer from other disabilities. According to Lane's guardian ad litem, "[Lane] is a sweet, somewhat shy little girl, who experiences a number of delays in her development." Lane has an individualized education plan at school and "has made progress ... with support from her aunt" who is "an excellent advocate for [Lane]." Lane's aunt stated that she and her husband were interested in adopting Lane and her little brother.
Prior to any contact with OCS, Sam was already taking advantage of services at Dena'ina Wellness Center in Kenai; he was attending PTSD support group meetings and seeing a behavioral health counselor to help with substance abuse issues and depression. Sam suffered from PTSD in part because he was sexually assaulted by a stranger when he was six. Early in 2016 Sam attempted suicide *734 and was hospitalized at the Alaska Psychiatric Institute (API). According to API records, Sam had a history of suicide attempts and self-harming. Sam also had a history of seizures that caused him to lose a number of jobs. Sam's parents are divorced, and he has lived off and on with each of them. His father has provided him with financial support. At the time of the termination trial he was mostly living with his mother.
B. Sam's Contact With OCS
Sam's first contact with OCS was sometime between August and October 2016 with Hannah Gorman, the first of three caseworkers assigned to his case. Gorman was only on the case for about a month before she left OCS. During that time she spoke with Sam briefly about visiting with Lane. She was not interested in placing Lane with him because he was living with his mother, a convicted sex offender;[3] Gorman also had concerns about Sam's treatment needs and Lane's desire to avoid contact with him at the time. When Gorman left the case, Sam was set up with a case manager and counselor at the Dena'ina Wellness Center.
In October the case was reassigned to OCS caseworker Chery Schaffan. She contacted Sam to schedule monthly meetings at OCS. She also sought to meet with him to develop a case plan. Schaffan testified that Sam disclosed mental health and substance abuse issues, a history of sexual abuse as a child, and a seizure disorder that affected his being able to maintain employment or drive. Sam reported not having been actively involved in Lane's life and not having seen her for the past couple of years. Schaffan arranged face-to-face contact between Sam and Lane. She described several visits that she supervised, and at each she characterized Sam as having difficulty engaging with Lane. Schaffan explained that visits ideally would have happened weekly, but because Sam lived in Soldotna and did not drive, transportation to Anchorage was a problem;[4] they tried to accomplish monthly visits instead. Schaffan stated that she saw improvement in the interactions between Sam and Lane throughout her time on the case. Sam disclosed his lack of prior experience parenting a child, specifically a child with special needs, and Schaffan spoke with him about taking parenting classes at the Dena'ina Wellness Center where he was already receiving other services.
In April 2017 Sam's counselor reported to OCS that Sam had disclosed sending and receiving nude photos with a 16-year-old female.[5] After receiving this report, Schaffan referred Sam for a psychological evaluation, a sex offender assessment, and a parenting assessment with Dr. Paul Turner, a clinical psychologist. Schaffan stated that she had phone conversations with Sam arranging, explaining, and getting his consent for the assessment, and that OCS paid for the assessment.
Dr. Turner evaluated Sam in August and September 2017. He also reviewed various records and discovered Sam's history of inappropriate sexual behavior, which included four incidents in addition to the April 2017 incident. He reviewed an Alaska Department of Public Safety incident report from October 2013, when Sam was 23 years old, which recorded that Sam reported having sex with a minor. The minor was interviewed and denied any sexual contact. He reviewed a superior court judgment, indicating that Sam pleaded guilty to sexual assault in the fourth degree after allegations that Sam had "inappropriate sexual behavior towards his sister." Dr. Turner also reviewed API records from 2016 indicating that Sam had engaged in inappropriate sexual behavior while at API. The API record stated: "This patient did have some difficulty with inappropriate statements with females and as a consequence a ten-foot boundary had to be placed on him." Dr. Turner testified that he was aware of an *735 additional incident that occurred when Sam was 18 and still in high school, in which he sent a picture of his genitals to a 17-year-old classmate and was charged with misuse of a cell phone.
Schaffan testified that she discussed Sam's pattern of inappropriate sexual behavior with him and that his response was "a lot of minimizing ... and he would refer me to his attorney." In response to a question about whether she ever considered placing Lane with Sam, Schaffan explained that Sam's father had been considered as a placement at a team decision meeting following a positive home study, but after receiving the reports of Sam's inappropriate sexual behavior, these plans were abandoned. Schaffan stated that OCS needed to address whether Sam's sexualized behavior would be a safety concern if Lane was placed in his care.
A third OCS caseworker, Michelle Fanning, was assigned the case in October 2017. It appears Fanning received a verbal report from Dr. Turner regarding his conclusions and filed a petition to terminate Sam's parental rights on October 30. Fanning received Dr. Turner's written report in November, but did not share the report with Sam. Fanning instead spoke with Sam about the report and recommended that he follow its recommendations. Fanning referred Sam to his attorney rather than answer specific questions about how long he needed to work on the recommendations. She testified that based on the report from Dr. Turner, Sam should have been referred for sex offender treatment, but that she did not make that referral. Fanning pointed to three visits she supervised between Sam and Lane from December 2017 to February 2018. Fanning characterized the visits as awkward and noninteractive.
C. Dr. Turner's Testimony And The Superior Court's Ruling
A termination trial was held over two days in April and May of 2018. OCS called Dr. Turner to testify at trial. Dr. Turner related Sam's history of inappropriate sexual behavior and testified that his "findings were that [Sam]'s risk to his daughter ... [is] at least moderate, because of his unusual sexual behavior, corroborated since 2013, and his complete denial of any involvement, sexual offending, except for one admission on one objective test." He explained:
[Sam had] engaged in inappropriate sexual behavior as recently as 2017. He denied any responsibility or guilt with his assault conviction, reduced to a misdemeanor. And I felt in this context that OCS had identified his daughter as autistic, so she's a vulnerable child, so there's safety concerns. I felt that his sexual risks were incompatible with the child protection requirements for his daughter's safety.
Dr. Turner opined that Sam "has borderline intellectual functioning with extremely low processing speed, which ... was a barrier to successful independent parenting," and that Sam "has less than minimally adequate parenting capability capacity." He explained that he recommended sex offender treatment for Sam, and Sam's prognosis for remedying his problems was poor. Dr. Turner believed "it would take some more years of treatment, plural."
Sam testified at the termination trial. He expressed his desire to parent Lane and to be a part of her life. In response to a question about how long it would be before Sam felt like he could independently parent Lane, he stated it would be "maybe a year, maybe two years." He suggested that his father could retain guardianship over Lane during that time.
The superior court commended Sam for making progress by receiving services from the Dena'ina Wellness Center. But the court observed that "there's still a lot of work to be done." The court balanced whether to extend the time for Sam to address his problems against Lane's clear need for permanency. The court questioned OCS's failure to refer Sam to sex offender treatment, and OCS responded that by the time OCS found out how serious Sam's sexual behavior issue was - when OCS received Dr. Turner's report - it was too late to address the issue.
The court, reflecting the guardian ad litem's testimony, summarized the history of the case, explaining that Sam and OCS were on the road to reunification and possible *736 placement with Sam's father, but when Sam's history of sexual misconduct came to light the situation became "unrecoverable" given the permanency concerns for Lane.
At the conclusion of the trial the court made an oral decision to terminate Sam's parental rights and then issued a written termination order in June 2018. The court found that Lane was a child in need of aid under AS 47.10.011(11) because Sam had "a mental illness, emotional disturbance, and mental deficiency of a nature and duration that place[d] [Lane] at substantial risk of physical harm or mental injury." The court found by "clear and convincing evidence that [OCS made] active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of this Indian family," and that those efforts were unsuccessful. The court also found that Sam failed to remedy the conduct or conditions that placed Lane at substantial risk of harm, that returning Lane to Sam would likely result in serious emotional or physical damage to her, and that terminating Sam's parental rights was in Lane's best interests. Sam appeals, arguing only that the superior court's active efforts finding was erroneous.
III. STANDARDS OF REVIEW
"Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact."[6] "We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[7] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves [us] with a definite and firm conviction that a mistake has been made."[8] "We will not reweigh evidence when the record provides clear support for the superior court's decision."[9]
IV. OCS MADE ACTIVE EFFORTS TO REUNIFY SAM WITH LANE.
ICWA provides that "[a]ny party seeking to effect a ... termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[10] OCS bears the burden to demonstrate by clear and convincing evidence that active efforts have been made.[11] We conduct "an active efforts inquiry on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[12] We look " 'to the state's involvement in its entirety' when reviewing a finding of active efforts."[13] The recently adopted federal regulation addressing active efforts explains that active efforts "means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[14]
Sam argues that OCS failed to make active efforts. He acknowledges that OCS made "several cognizable efforts" towards reunification, and that these efforts were having a positive impact on his ability to parent Lane and develop a bond with her.[15] The thrust of *737 Sam's argument is that his case was developing positively, but everything changed after Sam disclosed what he characterizes as his "quasi-accidental 'sexting' incident" to his counselor and his counselor reported the incident to OCS. Sam contends that OCS received the report of him sending and receiving nude photographs with an underage girl, referred him for a sexual offender assessment with Dr. Turner, and then made no additional efforts towards reunification - instead filing a termination petition almost directly after receiving Dr. Turner's verbal report.
The record reflects that OCS made significant active efforts toward reunifying Sam with Lane. Sam's first contact with OCS was with the initial caseworker assigned to the case, Gorman. They discussed visitation and the services Sam was already receiving at the Dena'ina Wellness Center. After Schaffan took over the case, she created a case plan with Sam. The case plan noted that Sam was financially dependent on his father and that he self-reported having no knowledge of how to parent but was willing to learn. Sam's case plan goals were to maintain sobriety and to develop parenting skills and strategies. Schaffan referred Sam to continue his mental health and substance abuse services at Dena'ina and to begin parenting classes. Schaffan also facilitated visits between Sam and Lane, and offered to fly Sam to Anchorage once every three months for visits. Schaffan contacted Sam's father and facilitated a home study by staff from the Kenai OCS office to determine whether Lane could potentially be placed there. Schaffan testified that she saw improvement in interactions between Sam and Lane during her time on the case. As Sam correctly points out in his brief, "[b]y most accounts, [OCS's] efforts, along with [Sam]'s own personal efforts, were helping to effect reunification."
But circumstances materially changed in April 2017 when OCS received a report from Sam's counselor that Sam had sent pictures of his genitals to a minor. OCS referred Sam for a psychological, sex offender, and parenting evaluation with Dr. Turner and paid for it. Dr. Turner concluded that Sam's "risk to his daughter in the sexual dimension is estimated to be at least moderate," or according to his testimony, "modest or high." Dr. Turner stated that Sam's "sexual risks appear to be incompatible with the child protection requirements for his daughter's safety at this time." Dr. Turner suggested sex offender treatment for Sam. By the time OCS learned of Dr. Turner's conclusions Lane was seven years old and had been in OCS custody for 14 months.
It appears that sometime prior to October 2017 OCS received a verbal report from Dr. Turner regarding his assessment of Sam. OCS made limited additional efforts toward reunification and instead petitioned to terminate Sam's parental rights in October. In its petition OCS explained that Dr. Turner had concluded that Sam's "prognosis to be able to safely parent a child is poor." Despite Sam engaging in his case plan, OCS explained in its petition that it remained "concerned with [Sam's] ability to parent a special needs child given his own cognitive limitations and mental health needs."
Given the unforeseen and material new information about Sam's history of sexual misconduct, including the very recent sending of pictures of his genitals to a minor girl; the lengthy amount of time it would take for Sam to participate and succeed in sexual offender treatment; and Lane's age and need for permanency, we agree with the superior court that the case was "unrecoverable," and we think it was reasonable for OCS to decide to immediately file a petition to terminate Sam's parental rights.
We have repeatedly held that courts are to look to OCS's efforts throughout the entire case to determine whether OCS made active efforts.[16] Here, Sam was receiving services to *738 address his mental health and substance abuse issues when OCS became involved in the case. The superior court recognized the progress Sam had made before and after OCS's involvement. But the court concluded that Sam's desire for more time to seek treatment for his sexual misconduct issues was outweighed by Lane's need for permanency.[17]
The record amply supports this conclusion. We have held that a "child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[18] We conclude the superior court did not err in finding that OCS made active efforts.
V. CONCLUSION
We AFFIRM the superior court's termination of Sam's parental rights.

Pseudonyms are used to protect the family members' privacy.

25 U.S.C. § 1903(4) (2018).

Sam's mother was convicted of a sex offense involving a minor and is a registered sex offender. Sam's OCS caseworker worried that this "would potentially hinder [Sam's] ability to himself receive treatment and be in a healthy environment where he could be able to one day parent his child."

Schaffan offered to fly Sam to Anchorage once every three months.

Sam was 27 years old at the time of this incident.

PhilipJ.v.State, Dep't of Health & Soc. Servs.,OfficeofChildren's Servs. , 314 P.3d 518, 526 (Alaska 2013).

Id.

Id. at 526-27 (quoting Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 249 P.3d 264, 269-70 (Alaska 2011) ).

Id. at 527.

25 U.S.C. § 1912(d) (2018).

CINA Rule 18(c)(2)(B).

Philip J. , 314 P.3d at 527 (quoting A.A. v. State, Dep't of Family & YouthServs. , 982 P.2d 256, 261 (Alaska 1999) ).

Id. (quoting Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 244 P.3d 1099, 1114 (Alaska 2010) ).

25 C.F.R. § 23.2 (2019).

Sam does not allege a deficiency with OCS's initial efforts until his reply brief. In his reply brief, Sam argues that the efforts OCS made in this case were not sufficient even to demonstrate reasonable efforts. He argues that because he was already engaged in mental health and substance abuse counseling services, and OCS simply told him to continue receiving services, its claimed efforts in this respect are actually properly attributed to him not to OCS. We will not consider arguments raised for the first time in a reply brief. Barnett v. Barnett , 238 P.3d 594, 603 (Alaska 2010).

See, e.g. , Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 212 P.3d 756, 765 (Alaska 2009) ("We analyze the state's active efforts based on its 'overall handling of the case.' " (quoting Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 184 P.3d 9, 16 (Alaska 2008) )); Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 175 P.3d 1263, 1268-69 (Alaska 2008) (concluding that even though OCS failed to make active efforts for three months, the superior court properly considered its efforts throughout the entire case).

The guardian ad litem and the tribal representative agreed with the court that Sam's parental rights should be terminated.

Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 310 P.3d 943, 954 (Alaska 2013) (quoting Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 233 P.3d 597, 603 (Alaska 2010) ).