NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JENNY A., | ) |
| | ) Supreme Court Nos. S-17670/17672 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-16-00253/ |
| v. | ) 00254/00255/00256/00257/00258/ |
| | ) 00259 CN (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) MEMORANDUM OPINION |
| | ) AND JUDGMENT* |
| Appellee. | ) No. 1825 – April 14, 2021 |
| | ) |
| WARREN P., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeals from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Jenny A. George W.P. Madeira, Jr., Assistant

---

* Entered under Alaska Appellate Rule 214.

Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Warren P. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

## I.   INTRODUCTION

Seven Indian children were removed from parental custody after multiple reports of domestic violence spanning several years. The children were placed in a foster home; their parents' violent behavior continued throughout the case and during the termination trial. After hearing expert testimony that return to their parents' custody would likely result in serious harm to the children, the trial court ultimately terminated parental rights.

On appeal the parents argue that the state failed to make active efforts to reunify the family. The mother further contests the court's finding that return to parental custody would likely harm the children, asserting that the finding was not supported by qualified expert testimony. But the record adequately supports the court's conclusions and we therefore affirm the termination of parental rights.

## II.   FACTS AND PROCEDURAL HISTORY

Jenny and Warren[1] are the parents of seven Indian children[2] whose custody

---

[1]      We use pseudonyms to protect the family's privacy.

[2]      An "Indian child" is defined in the Indian Child Welfare Act (ICWA) as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903 (2018).

(continued...)

is the subject of this appeal. On November 19, 2016, the Office of Children's Services (OCS) received a call from a hospital reporting that Jenny had (1) sought treatment for injuries allegedly resulting from domestic violence, (2) described a long history of violence in the relationship, and (3) stated that she had drawn a knife during the altercation that night. OCS assumed emergency custody of the children that night. After a hearing the trial court determined there was probable cause to find the children in need of aid due to their parents' history of domestic violence. It ordered that they remain in OCS custody.

When the children were removed from parental custody, they were in need of extensive medical care. Although several of the children struggled with serious medical problems,[3] the parents regularly failed to take them to physical therapy and doctor's appointments or administer medication and supplements as prescribed. OCS made physical and speech therapy appointments, arranged learning support services, and referred the children for counseling.

Jenny and Warren attended an initial case conference, and OCS created a case plan for each of them. The goals identified in the plans included visiting the

---

[2] (...continued)

Jenny and Warren are joint parents of the five younger children, and each has an older child from a former partner. At the time of the termination trial OCS was pursuing reunification between Jenny's older son and his birth father, who is not a participant in this case. Warren's older son lives with the younger children; his birth mother has relinquished her parental rights. The children now range from ages 6 to 16. Jenny's birth children all have tribal affiliation with Nondalton, which intervened in the case, and Warren's older son is believed to have affiliation with Utqiaġvik.

[3] The children's various medical issues included renal problems, ear infections, ADHD, rectal bleeding, failure to thrive, malnutrition, low birth weight and developmental delays, cardiopulmonary issues, and speech delays. Additionally, two of the children had issues with food, and six of them struggled with emotional or behavioral issues.

children, meeting regularly with a caseworker, completing psychological evaluations, and attending a family violence intervention program. OCS provided Jenny and Warren with transportation vouchers, assisted them with housing, referred them to domestic violence and parenting classes, and arranged psychological evaluations. The parents began weekly visitation with their children and attended the suggested classes.

Jenny and Warren also underwent psychological evaluations. The psychologist recommended individual therapy for both parents, but cautioned that the "interventions that can be recommended will likely be unsuccessful, because [Warren] does not believe he has any problems that need to be addressed." Similarly, she described Jenny as only "marginally cooperative and at this point only going through the motions. [Jenny] . . . does not believe she needs to change the way she parents." Both parents subsequently requested referrals for counseling, but several months elapsed between the psychologist's recommendation and OCS's referral.

After a contested adjudication trial the court again found the children in need of aid due to a pattern of domestic violence in the home. It cited Warren's "extensive history" of violent behavior, including two convictions for domestic violence assault, two petitions for protective orders against him, and OCS's previous involvement with the family due to reports of violence. The court expressed particular concern with reports from 2008 and 2015 in which Jenny had described a history of violence and alleged that Warren had injured one of the children.[4]

The court determined that the parents had not changed their harmful behaviors or "meaningfully engaged or actively participated in their domestic violence intervention programs." It found the children were at "direct risk of physical abuse by

---

[4] The court noted that Jenny had at times denied the domestic violence, but it did not find her testimony credible.

their parents" and "substantial risk of mental injury" due to their parents' ongoing violent conduct, and that return to parental custody was likely to result in physical or emotional harm to the children. The court again ordered that the children remain in OCS's custody.

The court also concluded that OCS had engaged in active efforts to reunify the family, which had been hampered by the parents' refusal to confront their domestic violence. However, it also noted that OCS had failed to provide joint visits with the children or referrals for individual counseling despite the parents' repeated requests, and cautioned that it would "look closely at [OCS]'s efforts going forward."

OCS did refer Jenny and Warren to individual therapy, although it initially sent them to a provider in a town they had recently left, and the parents completed intake interviews in February 2018. But Warren only attended one counseling session and Jenny stopped attending after two sessions.

A new primary caseworker was assigned to the family in May 2018. On learning that the parents were no longer attending therapy she began to look for a local provider, and in June 2018 referred Jenny and Warren to counseling services in Anchorage. The parents missed their initial appointments and administrative errors created further delays; the caseworker helped the parents reschedule, followed up with them and with the provider, and talked the parents through their initial opposition to therapy. Once counseling was established, Warren went to two sessions and Jenny three before they again ceased attendance. Two different caseworkers discussed the importance of therapy with the parents and encouraged them to re-engage, but Jenny and Warren gave no explanation for again abandoning the program.

Jenny and Warren did consistently visit their children. The parents initially visited separately, each seeing the children for one hour per week; the visits were later increased to 90 minutes and combined, giving both parents more time with the children.

Visitation frequency and length were limited due to the children's schedules and the availability of suitable facilities for the large family.

After observing the parents struggling during visits, their caseworker put together a document with examples of positive and negative parenting behaviors, healthy meal plan ideas, and ways to engage with the children. She explained that she made the document "as specific as possible so that . . . the parents and the staff understood what we were looking for." The caseworker also actively searched for a better venue which could accommodate the entire family while providing supervision and instruction in parenting skills; the visits were moved to the Alaska Youth & Family Network (AYFN), which the parents preferred.

AYFN temporarily separated Jenny's and Warren's visits with the children due to domestic violence concerns. The parents did resume joint visits, but after six months AYFN cancelled further visitation due to the parents' behavior — Jenny and Warren repeatedly argued with staff, failed to follow visitation plans, broke facility rules about giving the children gifts, and shared inappropriate information about the case. AYFN explained that it had "tried multiple ways to continue engaging the family, but . . . they are not willing to follow the rules or treat our staff with respect." Visitation moved to OCS offices, as no other facilities were available, and the parents were allegedly unready for unsupervised community visits.

Although Jenny and Warren completed domestic violence intervention classes, the violence continued. In June 2018 police responded to a violent dispute between them at a public campsite. Jenny later disclosed a history of domestic violence, telling an OCS caseworker that she was tired of the violence and of lying about the abuse, but that Warren beat her whenever she tried to leave. Jenny also described an incident that took place after the termination trial had begun in which Warren repeatedly threatened to stab her.

The termination trial was held over the course of seven days between February and August 2019. The court heard extensive testimony from OCS's expert witness Jaime Browning, whom the court qualified over the parents' objections as an expert in "child abuse, child welfare, child neglect[,] . . . child safety," and "the impacts of domestic violence on families with children." Browning explained that exposure to domestic violence could cause emotional and physical damage to children. She opined that this damage had already been suffered by Jenny's and Warren's children and would be compounded by their exposure to continued violence. She further stated, based on her review of the family's medical and legal records, that the parents were unlikely to change their damaging behavior patterns. Of particular concern, Browning noted that the violence had continued despite OCS's involvement in the case and during the termination trial, and would likely continue if the children returned. Browning therefore concluded that returning the children to parental custody would likely cause them to suffer significant harm as a result of the parents' violent behavior.

The trial court issued an order terminating Jenny's and Warren's parental rights on December 2, 2019. Both parents filed notices of appeal, and in April 2020 OCS moved to vacate the termination order. It identified two legally required findings omitted from the order, and noted that the trial court had relied on outdated ICWA guidelines. We vacated the order and remanded the matter for reconsideration on the existing record.

The amended termination order was largely identical to the vacated order. The court again found by clear and convincing evidence that OCS had made active efforts to prevent the breakup of Jenny's and Warren's family, and that those efforts had been unsuccessful. It briefly described OCS's actions, but did not discuss the need for individual counseling or increased visitation. While acknowledging that both parents had completed domestic violence programs, the court characterized this as "checking

-7-                                                        *1825*

boxes" while continuing to "engag[e] in known additional acts of domestic violence." It again concluded that Jenny and Warren had "refused to engage with [OCS]'s active efforts."

The court amended its discussion of expert witness qualifications to reflect current ICWA standards, which it concluded Browning satisfied. Noting that the "likelihood of harm" finding must be supported by expert testimony, the court stated that Browning had provided the required expert testimony and was credible. The court found that the children were in need of aid due to medical and general neglect, exposure to domestic violence, and a substantial risk of physical harm from their parents' behavior.[5] It cited the parents' failure to provide the children adequate nutrition or medical care and their history of "domestic violence and mutual combat." The court also added two new findings, determining that the parents had "made little progress in remedying the conduct that placed their children in need of aid" and "[t]here is proof beyond a reasonable doubt, including the testimony of an expert witness, that the continued custody of the children by [the parents] is likely to result in serious emotional or physical damage to the children."

The court again concluded that "termination of parental rights is in the best interests of the children." Jenny and Warren now appeal the amended order.

III. DISCUSSION

A. The Trial Court Did Not Clearly Err In Finding That OCS Made Active But Unsuccessful Efforts At Reunification.

Before terminating parental rights to an Indian child, a court must determine that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have

---

[5] AS 47.10.011(4), (6), (8)-(9) (stating conditions rendering a child in need of aid).

proved unsuccessful."[6] OCS must go beyond passively drawing up a case plan; it must assist the parent "through the steps of a case plan and with accessing or developing the resources necessary to satisfy the plan" in an "affirmative, active, thorough, and timely" manner.[7] Whether OCS made active efforts is a mixed question of fact and law: we review the trial court's factual findings for clear error, but whether those findings satisfy ICWA requirements is a question of law which we review de novo.[8] We evaluate the agency's involvement as a whole and may consider "a parent's demonstrated lack of willingness to participate in treatment."[9]

Jenny and Warren challenge the trial court's finding that OCS made sufficiently active efforts, arguing that the delayed referrals to individual counseling and the limited family visitation were inadequate to support reunification. While the parents correctly identify areas where OCS could have done more, we cannot say the trial court clearly erred in finding that active efforts were made.[10]

---

[6]     25 U.S.C. § 1912(d) (2018).

[7]     25 C.F.R. § 23.2 (2016); *Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1071 (Alaska 2018).

[8]     *Sam M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019). We find clear error if left with "a definite and firm conviction that a mistake has been made" after "a review of the entire record in the light most favorable to the prevailing party below." *Id.* (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526-27 (Alaska 2013)).

[9]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)).

[10]     Warren further argues that the efforts were not demonstrably "unsuccessful" because he was not given the time or resources which might have led to success. But his theory assumes the inadequacy of OCS's efforts; since we conclude that

(continued...)

The parents primarily argue that the belated referrals to counseling undermined progress towards family reunification and that OCS thus failed to make truly active efforts to prevent the breakup of the family. Jenny further speculates that individual therapy could have helped her escape her violent relationship with Warren. The parents point to the six months between the psychologist's recommendation of and OCS's initial referrals to individual counseling, noting that the trial court itself expressed frustration with the delay.

But OCS did make referrals for individual counseling, which the parents largely failed to engage with. After completing intake appointments with a health provider in their former community, Warren attended counseling only once and Jenny twice before discontinuing therapy. Their caseworker actively intervened to get Jenny and Warren back into counseling at a local facility; when the parents missed their intake appointments, she followed up with them, helped them reschedule, and discussed the benefits of mental health treatment with them. But having restarted counseling, the parents again attended only a few sessions before apparently abandoning the effort. The court did not clearly err in finding that OCS made active, albeit imperfect, efforts to provide Jenny and Warren with counseling.[11]

Jenny and Warren also argue that the visitation OCS allowed with their children was inadequate to support reunification; Warren additionally claims that the delay in combining the parents' visits undermined reunification and did not constitute active efforts. However, as Warren concedes in his brief, OCS did make efforts to

---

[10] (...continued)
sufficiently active efforts were made, this argument also fails.

[11] *See Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) ("[T]he active efforts requirement does not require perfection.").

increase the time and quality of visitation. It actively sought better opportunities for structured, supervised visits with parental skills coaching but struggled to find a venue able to accommodate the entire family, which Warren describes as a "complicated task." OCS initially separated the parents due to domestic violence concerns and the limited facilities adequate to support joint visits with the entire family; after Jenny and Warren received combined visitation it was eventually cancelled because AYFN refused the family further visits, not because of OCS action or inaction.

In short, OCS's efforts to support family visitation were hampered by a number of factors: the size of the family and the children's special needs, the limited facilities available, the domestic violence and safety concerns, and the difficulties created by the parents' behavior. Under these circumstances, the limitations and delays the parents identify do not negate OCS's efforts when considered as a whole.

We evaluate OCS's "involvement in its entirety."[12] In addition to counseling and family visits, OCS provided the parents with housing and transportation assistance, referred them to domestic violence intervention classes and parenting classes, and went through a detailed plan to improve parenting skills with them. The caseworker testified that she initially spent 35 to 40 hours per week on the family's case and that "there was more money put in this case by OCS than I've seen on any case." OCS's efforts were not perfect, but as a whole they were active; we therefore conclude that the trial court did not clearly err in finding they satisfied ICWA.[13]

---

[12]     *Maisy W.*, 175 P.3d at 1268.

[13]     Most of the truly active efforts were apparently made by the family's second assigned caseworker; prior to her assignment, OCS's actions seem to have consisted largely of drawing up case plans and making referrals — precisely the sort of efforts we have described as "merely passive." *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009) (citing *A.A. v. State,*

(continued...)

**B.      The Trial Court Did Not Err By Finding That Serious Harm To The Children Would Likely Result From Return To Parental Custody.**

Under ICWA an expert witness must testify to the causal relationship "between the conditions of the home and a threat to the specific child's emotional or physical well-being."[14]  Expert testimony need not directly address every aspect of this connection; courts may draw "reasonable inferences" from "the testimony of witnesses who are qualified to testify on the subject."[15]  ICWA heightens the requirements for experts, who must have "expertise beyond normal social worker qualifications."[16]

Jenny argues that OCS failed to provide qualified expert testimony showing that the children would likely suffer "serious emotional or physical damage" if returned to parental custody as required by ICWA.[17]  Jenny challenges both Browning's qualifications and the sufficiency of the causal link between parental behavior and likelihood of harm to the children.  But we conclude that Browning's expert

---

[13]      (...continued)
*Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).  However, because active efforts are viewed over the entirety of OCS involvement, and periods of failure do not render its efforts inactive as a whole, we conclude that the trial court did not clearly err in finding OCS's efforts sufficient under ICWA.  *See id.* at 763-64.

[14]      *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054 (Alaska 2019) (quoting U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 53 (2016) (2016 GUIDELINES)).

[15]      *Id.* at 1057.

[16]      *Id.* at 1054 (quoting 2016 GUIDELINES at 54).

[17]      25 U.S.C. § 1912(f).

qualifications and testimony satisfy ICWA's requirements and that the trial court did not clearly err in finding a likelihood of serious damage.[18]

The record shows that Browning's qualifications go beyond those of a "normal social worker."[19] She has formal education in and professional experience with domestic violence and child welfare. Applying current ICWA regulations, we have previously upheld a qualification of Browning as an expert in "child safety and development and how . . . domestic violence may impact a child's safety and development."[20] Finding Browning qualified to testify on these subjects was not error.

Jenny also questions Browning's lack of cultural expertise. But where expert testimony concerns damage to a child, "the ability to testify about 'the prevailing social and cultural standards' [of the child's tribe] is not essential in every case."[21] Browning testified on the effect of domestic violence on child welfare; specific knowledge of the children's tribes was thus not essential.

---

[18]    We review de novo the sufficiency of expert qualifications and testimony under ICWA. *Eva H.*, 436 P.3d at 1052. Whether the child would likely suffer serious harm is a question of fact which we review for clear error. *See Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017).

[19]    *Eva H.*, 436 P.3d at 1056.

[20]    *Addy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17427, 2020 WL 915975, at *4 (Alaska Feb. 26, 2020); *see also Trisha D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17696, 2020 WL 7238381, at *5-6 (Alaska Dec. 9, 2020); *Julio A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17603, 2020 WL 4497830, at *7 (Alaska Aug. 5, 2020); *Daphne O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16960, 2020 WL 1933651, at *4 (Alaska Apr. 22, 2020).

[21]    *Eva H.*, 436 P.3d at 1054 (quoting 2016 GUIDELINES at 54).

Jenny finally argues that Browning did not adequately testify to the causal relationship between specific conditions in Jenny's home and the likelihood of harm to the children if returned there and that the trial court therefore could not and did not conduct proper analysis of the likelihood of serious harm. But Browning's expert testimony was based on specific facts and documented instances of violence. She noted that Warren had engaged in domestic violence both before and during his relationship with Jenny. Browning described a continuing pattern of domestic violence which had already resulted in serious damage to the children and stated that the damage would continue to occur if they were returned to parental custody.[22] She explained how exposure to violence can seriously harm children both physically and emotionally, often creating life-long negative impacts.[23] This is the causal analysis required under ICWA.[24]

As Jenny observes, the court's amended termination order contains disturbingly little detail. The likelihood of harm analysis consists of two conclusory sentences, stating only that domestic violence "places the children at a substantial risk

---

[22]    Browning also testified about concerns that the children had not been receiving proper medical care when in their parents' custody. However, she identified exposure to violence as creating the greatest risk of harm.

[23]    We have previously recognized the "devastating impact" domestic violence has on children even when not directed towards them. *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1161–62 (Alaska 2000) (citing *In re J.A.*, 962 P.2d 173, 178 (Alaska 1998)); *see also Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1257-58 (Alaska 2010); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 55 (Alaska 2003).

[24]    As we explained in *Eva H.*, and the trial court recognized in its order, ICWA specifically requires an expert to address causation, not merely correlation. *Eva H.*, 436 P.3d at 1056-58 (citing 25 C.F.R. § 23.122(a)). The court cannot rely on an "admission" that an expert "can certainly speak to correlations between parental conduct and conditions that cause children to be in need of aid."

of physical harm, especially since knives have been used," and that "[e]xposure to domestic violence is damaging." But the court did identify specific facts on which it relied in drawing its conclusions, did cite Browning's expert testimony (however cursorily), and did make the express findings regarding likelihood of harm required to terminate parental rights to an Indian child. The amended order is thus minimally sufficient to satisfy ICWA. That said, we strongly encourage the trial courts to strive for more than minimal sufficiency.

## IV. CONCLUSION

We AFFIRM the trial court's termination of Jenny's and Warren's parental rights.