NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| VERA S., ) | |
| ) | Supreme Court No. S-17870 |
| Appellant, ) | |
| ) | Superior Court Nos. 3NA-16-00003/ |
| v. ) | 00004 CN |
| ) | |
| STATE OF ALASKA, DEPARTMENT ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, ) | AND JUDGMENT[*] |
| OFFICE OF CHILDREN'S SERVICES, ) | |
| ) | No. 1832 – June 9, 2021 |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Naknek, Christina L. Reigh, Judge.

Appearances: Jason A. Weiner, Gazewood & Weiner, P.C., Fairbanks, for Appellant. Jessica M. Alloway, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan Justices.

## I. INTRODUCTION

The Office of Children's Services (OCS) removed four children from their parents' custody. The superior court terminated parental rights, finding the children in

---

[*]    Entered under Alaska Appellate Rule 214.

need of aid due to their exposure to domestic violence and their parents' substance abuse. The mother appeals the termination of her rights to the two youngest children, arguing that the superior court erred by finding that OCS made active efforts to reunify the family and that she had failed to remedy the conduct or conditions that placed the children in need of aid. Because the superior court did not err, we affirm its findings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Vera[1] and Irwin are the parents of four children, two boys and two girls. The children are Indian children[2] and the Indian Child Welfare Act (ICWA) establishes the legal standards for resolving this child protection matter.[3]

Vera and Irwin's relationship ended in 2012 or 2013. Vera then began dating, and eventually married, Oliver S., despite knowing he was a registered sex offender.

An OCS caseworker first traveled to the family's home in 2011 or early 2012 after receiving reports about parental substance abuse and violence. The caseworker discussed the reports with both parents and made recommendations to them for services to address the problems. The caseworker maintained contact with the family as OCS continued to receive reports about alcohol and violence in their home.

In January 2016 OCS received a report that a sex offender was living in the home and adults were abusing substances. OCS removed the children from their parents'

---

[1]    We use pseudonyms to protect the parties' privacy.

[2]    *See* 25 U.S.C. § 1903(4) (2018) (defining "Indian child" as "any unmarried person . . . under age eighteen and . . . either . . . a member of an Indian tribe or . . . eligible for membership . . . and . . the biological child of a member").

[3]    *See id.* § 1912 (specifying requirements for state proceedings for foster care placement of or termination of parental rights to Indian children).

home a week later after the children reported that Oliver slept in the same bed as the girls and Vera, and that there had been a recent incident in which a number of adults were extremely intoxicated, fights broke out, and three people needed medical attention. OCS filed an emergency custody petition that included a detailed history of the children's exposure to substance abuse, domestic violence, and Oliver. The court granted the petition, finding that the children were in need of aid under AS 47.10.011[4] and awarding OCS temporary custody.

OCS created a family contact plan and a case plan for Vera that listed the steps she needed to take to regain custody of the children. Before the children would be returned, OCS required Vera to demonstrate that she could put her children's needs before her own, keep them safe, and provide for them. Vera's case plan therefore required her to complete an intake assessment at Bristol Bay Area Health Consortium (BBAHC), a psychological evaluation, and a substance abuse assessment, and to work with a domestic violence advocate. Vera was also required to comply with any recommendations that came from the professionals who assessed or evaluated her.

Because the family lived in a small remote community, OCS agreed that in addition to referring Vera for services, it would help her make appointments, arrange her travel to the programs and providers who would do the assessments and treatment, and assist her with getting the necessary releases of information so they could "monitor and motivate" her progress. The case plan also provided that OCS would arrange visitation with the children and have monthly contact with the family.

The assigned caseworker arranged and paid for Vera to travel to Anchorage for a psychological evaluation in August 2016. To enable Vera to participate in

---

[4]     AS 47.10.011 specifies bases to find that a child is in need of aid (CINA). When an Indian child is the subject of a CINA proceeding, ICWA establishes additional requirements. *See generally* 25 U.S.C. § 1912(f).

substance abuse assessment without leaving home, OCS provided funding for the assessment through BBAHC. After the assessor recommended "high intensity residential" treatment for Vera's substance abuse, OCS arranged for Vera to travel to Dillingham so she could do the treatment at Jake's Place, a residential substance abuse treatment program. Vera completed substance abuse treatment and sessions on domestic violence and parenting skills there in 2017 and returned home.

OCS updated Vera's case plan after the psychological evaluation and her substance abuse treatment. The updated case plan required her to continue with substance abuse aftercare and with counseling through BBAHC, as well as to contact a domestic violence support organization. After Vera told the psychologist that she did not believe Oliver posed a danger to her children, OCS required her to "talk with [a] counselor about the risks of sexual abuse of a minor which has elevated due to her living arrangements [and] [Oliver's] substance abuse issues." To help her accomplish the goals set in her case plan, OCS would monitor Vera's "attendance, updates, progress, [and] needs."

Soon after she returned from Jake's Place, Vera suffered a brain aneurysm. She was medevaced first to Anchorage and then to Seattle for treatment. It appears that Vera's recuperation from the aneurysm as well as an "issue . . . getting her and [a mental health counselor] connected with each other" led to a delay in her participation in aftercare. She was, however, able to have several appointments with a BBAHC counselor via telehealth. Vera maintained her sobriety until late 2017 or early 2018.

In January 2018 Oliver was arrested and charged with a murder committed in 2016. Vera admitted she had been present when Oliver shot and killed a man, but claimed she had not seen it. After Oliver's arrest, Vera renewed her relationship with Irwin. OCS started receiving reports that Vera was abusing alcohol and was involved in domestic violence.

In April 2019 Vera's brother found phone memory cards containing hundreds of photographs of Oliver "having sexual acts with [Vera's] daughters" and other "kids in the village." Although Vera had previously told OCS she did not believe Oliver posed any danger to her children, she reported that the photographs made her "distraught" because she had not been aware that he was sexually abusing children. She "was drinking alcohol" and "considering suicide."

When OCS learned of Vera's relapse, it created a new case plan and arranged for her to participate in substance abuse assessment and treatment at Jake's Place for a second time. Vera completed this second round of treatment in August 2019. OCS arranged for her to remain in Dillingham for aftercare and "really strongly encouraged" her to stay there for more personal support.

Vera "elect[ed] to go . . . back [home]" instead. But first she attended a program called Beauty for Ashes to help her address post-traumatic stress as a survivor of domestic violence. Vera then completed aftercare at home. Although the caseworker did not "know a whole lot about the program," she concluded "it was very good for [Vera]" based upon the changes she "could hear . . . in [Vera's] voice" afterward. OCS monitored Vera's progress after her return and confirmed that she was "doing her domestic violence activities" and classes through telehealth services.

Vera relapsed again in 2019 after completing treatment and aftercare. OCS created a new family contact plan in November 2019, and updated her case plan in May 2020, noting that she needed to work with her behavioral health counselor and "remain substance free." The case plan included the phone number for BBAHC's counseling department and indicated that OCS had made another referral for Vera. But Vera "never got in touch with" the counselor.

**B. Termination Of Parental Rights**

OCS filed a petition to terminate Vera's parental rights in September 2019, and trial was held on June 30 and July 1, 2020. OCS presented five witnesses; Vera testified as well.

The initial OCS caseworker described the events that led to the children's removal. She also outlined her efforts in the years both before and after OCS filed its emergency petition to assist Vera to obtain substance abuse assessments, family therapy, and parenting classes. And she described her inability to get Vera to acknowledge the danger Oliver presented to her daughters.

A state trooper testified about his "approximately nine" alcohol related encounters with Vera and multiple assault calls with Vera as either the victim or a witness. He testified that his last alcohol related contact with Vera was in 2018. The trooper had also investigated the murder and child pornography charges against Oliver. And he testified he had contact with Irwin multiple times as well, including for sexual assaults, alcohol, and domestic violence incidents.

The caseworker who had assumed responsibility for the case after the court granted temporary custody to OCS testified next. She acknowledged that during the four years she had been assigned to the case, Vera had made progress toward the goals in her case plan. But she also noted Vera's multiple relapses and her failure to recognize that her children were at risk. The caseworker testified that Vera had not changed her behavior — she did not recognize the risk of sexual abuse from having Oliver sleep in the same bed with her daughters or that she had harmed them by exposing them to domestic violence and alcohol abuse. She described Vera's conduct as "cycles repeating itself."

OCS's final witness was presented as an expert on "the impact of alcoholism, violence, and sexual abuse as it relates to child safety." He testified that

returning the children to Vera would "likely result in serious physical or emotional harm to the kids."[5]  He expressed particular concern about her failure to protect the girls from Oliver, as well as her history of substance abuse and relationships with violent partners.

Vera testified last.  She stated that she realized substance abuse had led to her "not being there for" her children and that, after seeing the photographs of Oliver sexually abusing children, she realized Oliver presented a danger to her girls.  She testified that she now believed that Oliver had sexually abused her older daughter and acknowledged that she knew Oliver was a sex offender when they met.  But she explained that because Oliver's family assured her he was not dangerous and her daughter "always [said] no" when Vera asked if Oliver "ever bothered her," she had not been concerned about having him in the family home.

Vera testified that when her brother showed her the phone memory cards with hundreds of sexually explicit pictures of children, including her daughter, she immediately called the local state trooper.  And when she again asked her daughter if Oliver had touched her, the girl told her for the first time that Oliver had.

Vera testified that she wanted to divorce Oliver and that she tried to send him divorce papers twice but it was difficult to get them to him in jail.  She also stated that being in a small village without a notary public made finalizing the paperwork and divorcing him more complicated.

Vera also testified that the OCS caseworkers had been difficult to communicate with and said they sometimes sent information to her through the girls' foster parent instead of contacting her directly.  But despite their "issues communicating," Vera said she took advantage of the services OCS offered and was

---

[5]      *See* 25 U.S.C. § 1912(f) (requiring testimony of qualified expert witness that continued custody of child by parent is likely to result in serious emotional or physical damage before termination may be ordered).

"changing [her] life." She protested that OCS was "only going by what happened in the past" and not giving her credit for how she "chang[ed] [her] life around now."

On cross-examination Vera acknowledged that she had only been sober since January 2020 but could not identify her actual sobriety date. She described her longest period of sobriety as thirteen months in 2018. And she conceded she was not engaging in Alcoholics Anonymous (AA) services because "phone service is bad" in her village, but said she would participate when she was in Dillingham. She also admitted that she had not spoken to her AA sponsor for five months or completed all of AA's twelve steps.

Vera denied that she exposed her children to alcohol or domestic violence, but she did acknowledge that Oliver "was a child molester" and that she "hurt [her] children by letting him in." And she testified that once she learned from the photographs that Oliver was a child molester, she realized her relationship with Oliver led to her daughter "being victimized by sexual abuse." Vera reiterated that she planned to file divorce papers before she returned home.

The superior court terminated Vera's parental rights in August 2020. The court found by clear and convincing evidence that the children remained in need of aid because Vera had abandoned[6] and neglected[7] them and failed to protect them from Oliver's sexual abuse.[8] The court also found that her ability to parent had been

---

[6]    AS 47.10.011(1).

[7]    AS 47.10.011(9); *see also* AS 47.10.014 (defining neglect).

[8]    AS 47.10.011(7).

substantially impaired by her substance abuse[9] and her mental illness,[10] and that her conduct had caused mental injury to the children.[11] The court also found that OCS had made active efforts to prevent the breakup of the family and that Vera had failed to remedy the conditions that placed the children at risk of substantial harm. Finally the court found that returning them to Vera would "likely . . . result in serious emotional or physical damage" to the children.[12] The court therefore terminated Vera's parental rights.

In its findings of fact the court focused on Vera's history of alcohol abuse, her involvement in alcohol-fueled violence, and her failure to protect the children from Oliver. The court noted that despite OCS's warnings that allowing Oliver, a registered sex offender, in the house placed her children in danger, Vera remained married to him and "became defensive and denied that [he] was living in the home." The court observed that although Vera had "immediately contacted law enforcement" after seeing the photographs of sexual abuse, on another occasion Vera had not believed her daughter's report to the foster parent that Oliver had touched her.

The court summarized Vera's history of substance abuse, treatment, and relapses. It noted that OCS's first contact with Vera and the children was based on "reports of parental substance abuse," and that Vera was diagnosed with "severe alcohol use disorder" in April 2019. The court did not find Vera's testimony about her current

---

[9]    AS 47.10.011(10).

[10]    AS 47.10.011(11).

[11]    AS 47.10.011(8).

[12]    *See* 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered . . . in the absence of a determination . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.").

sobriety credible, noting that her inability to remember her first day of sobriety indicated that "she [was] not being truthful about" her drinking. The court also observed that the January 2020 date Vera "th[ought] [was] her [sobriety] anniversary date" was after she had completed two rounds of inpatient treatment and aftercare, indicating that she had not maintained her sobriety despite the treatment she completed.

The court also highlighted the violence in Vera's relationships and her refusal to end those relationships. It observed that the children had reported in 2012 that there was a "violent, alcohol-fueled incident with numerous family members at the home." The court also noted that Vera ignored the risk of sexual abuse and violence to the children even though all four of her children "were afraid of [Oliver] and . . . reported [he] abused alcohol and was violent." And the court noted that after Oliver's arrest, Vera reunited with Irwin, who "kicked her in the head and possibly broke her jaw" in January 2019.

The court found by clear and convincing evidence that OCS had made active efforts to prevent the breakup of the family. It noted that OCS "provided a variety of services to" Vera. It "engaged in case planning," arranged "[t]elephonic and in-person visits" for Vera, paid her travel expenses, and scheduled and paid for a neuropsychological evaluation. OCS arranged for Vera to attend inpatient treatment in 2017, a second substance abuse assessment in April 2019, and a second round of treatment at Jake's Place after Vera's relapse. The court observed that even though Jake's Place "had aftercare arranged," Vera chose not to do it immediately, creating "a significant gap during a vulnerable time for relapse."

Finally, the court concluded that Vera had "been given ample time to remedy the safety issues that brought the children into [OCS's] custody[] but ha[d] been unable to do so." It noted that since the children's removal, Vera "continue[d] to relapse" with alcohol and was not "able to demonstrate a change in [her] behavior[] that

would avoid harm to the children." The court specifically found that Vera's claim she was now sober was not credible and that substance abuse "plague[d] . . . [Vera's] ability to protect the children from harm." Vera's continued marriage to Oliver also "indicat[ed] that she does not intend to end that relationship," demonstrated an "unwillingness to prioritize her children's safety over her own relationships," and showed that she "w[ould] continue" to "place her children at risk of serious harm." Because Vera had "not prioritized the children's safety," the court determined that OCS had proven beyond a reasonable doubt that custody with Vera was "likely to result in serious emotional or physical damage to the children." The court terminated her parental rights.

Vera appeals the termination of her parental rights to her two daughters, arguing that the superior court erred by finding that OCS had made active efforts to prevent the breakup of her family and that she had not remedied the conduct or conditions that led to her children needing aid. She does not appeal the termination of her parental rights to her sons.

## III. STANDARD OF REVIEW

"Whether [OCS] complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[13] We review "the superior court's findings for clear error," but "review de novo whether those findings satisfy the requirements of CINA rules and ICWA."[14] We "will sustain the [superior] court's factual findings unless they are clearly erroneous. . . . [F]indings are clearly erroneous if a review of the entire record

---

[13] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) (second alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[14] *Sam M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[15]

## IV.    DISCUSSION

Vera first argues that the superior court erred when it determined that OCS made active efforts to reunify her family.  She also argues that the court erred when it found that she had not remedied the conduct that led to the girls being in need of aid.  We affirm the superior court's findings and its order terminating Vera's parental rights.

### A.    The Superior Court Did Not Err By Finding That OCS Made Active Efforts To Prevent The Breakup Of Vera's Family.

Vera claims that OCS failed to establish that it made active efforts to reunify her with her children.  She focuses on the year before the termination trial.  Vera asserts that OCS failed to prove it followed up with her about "AA attendance, aftercare program attendance, sobriety support system, or employment" after she completed substance abuse treatment for the second time.  The superior court found that "OCS provided a variety of services to [Vera] . . . aimed at avoiding removal."  In addition to providing repeated "referrals for mental health treatment, substance abuse treatment, domestic violence advocacy and parenting classes," OCS helped Vera apply and enter various programs.

ICWA requires that a "party seeking to effect a . . . termination of parental rights to[] an Indian child . . . [prove] that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[16]  Active efforts are "affirmative, active, thorough, and timely efforts intended primarily to maintain or

---

[15]    *Marcia V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[16]    25 U.S.C. § 1912(d) (2018); *see also* 25 C.F.R. § 23.120(a) (2020).

reunite an Indian child with his or her family."[17]  We examine OCS's efforts on a case-by-case basis, considering "[OCS's] involvement in its entirety."[18]  Our concern is whether OCS's efforts "cross[] the threshold between passive and active."[19]

Active efforts exist when we can determine that the "caseworker [took] the client through the steps of the plan rather than requiring that the plan be performed on its own,"[20] that OCS helped the parents "identify appropriate programs and complete the necessary paperwork to apply," or "connect[ed] them to other resources" rather than simply referring them to services.[21]  The "active efforts requirement does not require perfection,"[22] and the fact that "OCS could have done more does not undermine the other active efforts that OCS made."[23]  And "[a]ctive efforts must be documented in detail in the record."[24]

OCS completed or helped Vera complete the necessary paperwork, arranged for her to receive treatment at Jake's Place twice, paid for her to get there, and

---

[17]     *Sam M.*, 442 P.3d at 736 (quoting 25 C.F.R. § 23.2 (2020)).

[18]     *Maisy W.*, 175 P.3d at 1268.

[19]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[20]     *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010).

[21]     *Bill S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 976, 982 (Alaska 2019).

[22]     *Pravat P.*, 249 P.3d at 272.

[23]     *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 530 (Alaska 2013).

[24]     *Bill S.*, 436 P.3d at 981 (alteration in original) (quoting 25 C.F.R. § 23.120(b)).

ensured that aftercare was arranged so that she could remain in Dillingham to complete it. When the caseworker learned that Vera had attended the Beauty for Ashes program, she encouraged Vera to continue the progress she had made there with her mental health counselor. The caseworker arranged counseling after Vera completed aftercare, but Vera never attended. She also arranged visits with the girls and updated Vera's case plan and family contact plan as Vera completed services. OCS also provided the children with counseling, worked to keep them together, provided them with clothing, and visited them.

The superior court did not err by concluding that OCS's efforts were active throughout Vera's case. Even if Vera found it difficult to communicate with OCS, the caseworkers' efforts over the years OCS was involved with the family exceed the requirements for active, rather than passive, efforts. Evidence before the superior court made clear that OCS caseworkers "[took] [Vera] through the steps of [her] [case] plan rather than requiring that [it] be performed on its own";[25] "identif[ied] appropriate programs and complete[d] the necessary paperwork to apply"; and "connected [Vera] to other resources."[26] Even if OCS could have done more to assist Vera, "active efforts . . . do[] not require perfection."[27]

B.     **The Superior Court Did Not Err By Finding That Vera Failed To Remedy The Conduct Or Conditions Causing The Children To Be In Need Of Aid.**

"In order to terminate parental rights, the superior court must find by clear and convincing evidence that the parent has failed, within a reasonable time, to remedy

---

[25]     *Dale H.*, 235 P.3d at 213.

[26]     *Bill S.*, 436 P.3d at 982.

[27]     *Philip J.*, 314 P.3d at 530 (quoting *Pravat P.*, 249 P.3d at 272).

the conduct that placed the child at substantial risk of harm."[28]   To make this determination, "the court may consider any fact relating to the best interests of the child."[29]   "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[30]   Even if a parent makes "strides towards remedying her conduct," a court can consider prior relapses and whether the "sobriety is still very new" as a predictor of future behavior.[31]

The superior court found beyond a reasonable doubt that custody with Vera was "likely to result in serious emotional or physical damage to the children."  It also found that Vera had not demonstrated a change in her behavior that would "avoid harm to the children."  It specifically noted her multiple relapses and continued marriage to Oliver.  The record supports the superior court's determination.

---

[28]   *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014); *see also* AS 47.10.088(a) ("[T]he rights and responsibilities of the parent regarding the child may be terminated . . . if the court finds by clear and convincing evidence that . . . the parent . . . has not remedied the conduct or conditions in the home that place the child at substantial risk of harm[] or . . . has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.").

[29]   AS 47.10.088(b).

[30]   *Sherry R.*, 332 P.3d at 1274 (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003)).

[31]   *Sherry R.*, 74 P.3d at 903; *see also Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1112-13 (Alaska 2010) (affirming superior court's failure to remedy decision because nine-month period of sobriety following years of alcohol abuse was insufficient to demonstrate timely remedying of conduct); *Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 475-76 (Alaska 2013) (affirming superior court's determination that four and one-half months of sobriety outside of residential treatment is insufficient to establish a timely remediation of addiction).

Vera was unable to identify the exact date of her sobriety, saying only that it was some time in January 2020 — a few months before the termination trial. She also acknowledged that she was not consistently participating in AA (nor had she spoken to her sponsor in some five months) or in the counseling that OCS had arranged for her to do either in Dillingham or remotely. Vera relapsed repeatedly, using both alcohol and drugs, even after completing her second round of inpatient treatment and aftercare. Because Vera's sobriety was "still very new,"[32] there was an increased likelihood that she could relapse again.

Despite seeing hundreds of photographs of Oliver sexually abusing her daughter and other children, Vera remained married to him. And after Oliver was arrested for murder, Vera resumed her previous relationship with Irwin, despite his history of domestic violence and despite new acts of violence against her. Because her substance abuse and abusive relationships continued to pose a danger to her children, the superior court did not err by finding that Vera failed to remedy her conduct.

## V. CONCLUSION

We AFFIRM the superior court's decisions.

---

[32]     *Sherry R.*, 74 P.3d at 903.